THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EFREN MELCHOR, Defendant-Appellant.

First District (1st Division)   No. 1—03—3036

Opinion filed June 28, 2005.—Rehearing denied November 9, 2005.—Modified opinion filed November 14, 2005.

336

Michael J. Pelletier and Yasaman Hannah Navai, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Veronica

Calderon, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BURKE delivered the opinion of the court:
Following a jury trial, defendant Efren Melchor was found guilty of first degree murder and sentenced to 40 years' imprisonment. On appeal, defendant contends that: (1) the admission of a deceased eyewitness's testimony under the former testimony exception to the hearsay rule in section 115—10.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—10.4 (West 2002)) violated his confrontation rights pursuant to *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004); (2) the admission of the deceased eyewitness's testimony was erroneous because it lacked sufficient guarantees of trustworthiness; (3) the trial court erred in admitting testimony from a police officer confirming the deceased witness's identification of defendant in a lineup in violation of section 115—12 of the Code (725 ILCS 5/115—12 (West 2002)) and in violation of *Crawford*; (4) the trial court denied defendant his right to present a defense by excluding testimony from his brother regarding threats made against his brother and himself; (5) the trial court erred in admitting gang evidence testimony; (6) the prosecutor engaged in misconduct in closing argument by suggesting defendant fabricated a defense and in misstating evidence regarding the lineup; (7) the trial court's 40-year sentence was excessive; and (8) the trial court failed to properly admonish defendant pursuant to Supreme Court Rule 605(a) (134 Ill. 2d R. 605(a)). For the reasons set forth below, we reverse defendant's conviction and vacate his sentence and remand.

## STATEMENT OF FACTS

On April 30, 1990, Steven Botello was shot to death at 2624 West Fullerton in Chicago. Defendant and codefendant, Ancermo Paredes, were arrested on May 6 and were identified in a lineup as being involved in the shooting. Thereafter, both were indicted on two counts of murder. After being released on bond, defendant failed to appear in court and, on October 2, his bond was forfeited and a warrant for his arrest was issued. Defendant remained a fugitive for the next 10 years. On May 15, 1991, codefendant's bench trial began. At this trial, Luis Ortiz, then 16 years old, the sole eyewitness to the shooting testified, implicating both codefendant and defendant. On May 20, codefendant was found not guilty. On September 11, 1998, Ortiz died as a result of a drug overdose. In addition, at some point, codefendant was deported to Mexico.

On October 15, 2000, defendant was again arrested. Prior to defendant's trial, the State indicated its intent to use Ortiz's and

codefendant's testimony from codefendant's trial because both were unavailable. Defendant filed a motion to preclude the State from using their testimony, arguing that its use would violate his confrontation rights and that the testimony, particularly Ortiz's, did not bear sufficient guarantees of trustworthiness. After a hearing, at which the State confirmed Ortiz was the sole eyewitness to the shooting, the trial court concluded that his testimony was "more probative" on the question of whether or not defendant was present at the scene of the shooting and whether he was the shooter. The court then noted that while Ortiz's testimony was given under oath at a hearing, there had been no cross-examination by defendant or anyone on his behalf, but only on behalf of codefendant. Despite this, the court concluded that Ortiz's testimony was trustworthy and there were "equivalent guarantees of trustworthiness" to admit it. However, the court denied the State's request to use codefendant's prior testimony.

Defendant's jury trial began on March 18, 2003. Julio Diaz, who was 30 years old at the time of defendant's trial, testified that on April 29, 1990, from approximately 9 p.m. to midnight, he was playing basketball in Haas Park at Fullerton and Washtenaw with Ortiz, Botello, and "Tootie." According to Diaz, the group shared a quart of beer. At approximately 11:30 p.m., the group left the park and was walking down Fullerton to get more beer. At this time, they saw four Hispanics coming in their direction on the same side of the street, none of whom Diaz recognized. Tootie said he was going to "mess with" them, to which Diaz responded there was no need for that. When the Hispanics were near Diaz's group, Tootie made a motion like he was going to hit them in the groin or stomach. According to Diaz, the Mexicans then crossed the street and started swearing at Diaz's group in Spanish. Botello said "let's fight," so Diaz's group, with the exception of Tootie, who ran away, walked across the street. Diaz further stated that the Mexicans were throwing bottles and bricks at his group, his group ran toward them, and a "free for all" fistfight began. After approximately 10 minutes, the fight broke up because Botello yelled that the law was coming. Just prior to this, Jamie Figueroa (also deceased at the time of defendant's trial) and Mario Lopez had joined the fight.

Diaz also testified that he and Figueroa hid in a viaduct for a few minutes after the fight broke up and then went to a pay phone. At this time, Ortiz and Botello were also there. The group then walked to Fullerton and California because Botello wanted to see his daughter. At this intersection, there was a Shell and Amoco gas station on either corner. Diaz walked toward the Shell station to say hello to someone he knew. Approximately 10 minutes later, Botello returned. According

to Diaz, as Botello was walking toward the station, Diaz saw a two-door gray Toyota hatchback attempt to hit Botello. Diaz also saw four individuals in the car and recognized at least one of them as one of the guys his group had been fighting with earlier.[1] His group then started walking eastbound on Fullerton toward "Bunkie's Tavern." Diaz saw "Flash," whom he spoke with for a few minutes, and then he went to the Goethe School playground to tell Flash's girlfriend that Flash was on Fullerton. While talking to this girl, Diaz heard two sounds like firecrackers. According to Diaz, he got on a bike and rode toward Fullerton. He saw a squad car and Botello on the ground. It was his belief that the cop had hit Botello. Diaz then rode to the Amoco station, got two hotdogs, and ate one of them. He got back on the bike and rode eastbound on Fullerton. Botello was still on the street and, at this time, Diaz found out that Botello had been shot.

Diaz further testified that the guy he recognized in the car whom he had been fighting with was codefendant. Defense counsel then requested a sidebar, at which time he asked to inquire of Diaz about his gang affiliation. The court indicated that counsel could ask Diaz only if he was a gang member and, if so, which one. The State, upon resuming questioning of Diaz, presumably in anticipation of defense counsel's questions, asked him whether he was in a gang, to which he responded in the affirmative, stating he was a member of the Latin Lovers. Diaz further stated that Ortiz, Botello, Figueroa, Lopez, and Tootie were also in the same gang. Diaz also stated that he knew the four Mexicans were not in a gang because "you could tell," and that the fight did not start as a result of gang rivalry, but because Botello opened his mouth.

On cross-examination, Diaz testified that he was fighting with defendant. He then said he was fighting with the individual shown in a photograph (codefendant), who was the individual he identified in a lineup. Diaz then again stated he had fought with defendant and, upon viewing him in court, stated defendant looked different now.[2] Diaz then admitted that he never observed Botello's shooter.

Christopher Donnelly, the assistant State's Attorney who was responsible for trying codefendant in 1991, read Ortiz's testimony from codefendant's trial. Ortiz testified that he had been friends with Botello and Diaz for 10 years. On April 29, 1990, Ortiz was with Botello, Diaz, and Tootie at Harris Park, located at Fullerton and Fair-

---

[1]Diaz's testimony was not clear as to how many individuals in the car he recognized, as discussed below.

[2]This testimony encompassed five pages of the record, and during the whole of it, the person whom Diaz fought with is not clear.

field, playing basketball.[3] Ortiz's testimony regarding the fight and attempted hit-and-run was basically consistent with Diaz's testimony. Ortiz, too, stated there were four individuals in the car and that he saw the faces of two individuals in the backseat. Ortiz identified codefendant as one of the individuals he saw and as one of the individuals he had seen earlier that night in the fight. He further stated that he saw the shooter (however, he did not identify who this was at codefendant's trial), first stating the shooter was in the driver's-side rear seat and then stating he was in the front passenger seat.

Ortiz and his group then walked eastbound down Fullerton. Ortiz first said the group was going to a park and then said, "No," they were "just gonna walk around." According to Ortiz, when the group was in front of "Bonkey's Tavern," he saw Flash, Wilfredo Hernandez, and Shorty, whom he spoke with. Ortiz stated that Diaz left on a bike to go to Gaither Park. Botello also rode off on a bike he got from Shorty because he had left his wallet at the park, heading westbound on Fullerton toward California. Ortiz observed Botello looking for his wallet, when a little gray car pulled in the parking lot by the park. Ortiz first stated he did not recognize the car and then stated he did—it was the same car that tried to run Botello over. According to Ortiz, the passenger-side door opened, a guy got out, reached over the roof of the car, and shot Botello. The guy then got back in the car and it drove off.

Ortiz further testified that on May 6, 1990, he went to Area 5 and viewed a lineup out of which he identified two individuals. Ortiz stated that he identified the first individual, codefendant, as one of the individuals he had been fighting with and the second individual, defendant, as the shooter, but not someone who had been involved in the fight. Ortiz further stated that he had first seen these two individuals in the parking lot at the Shell station in the gray Toyota. Specifically, he stated that codefendant was the backseat passenger and defendant was the front seat passenger.

On cross-examination, Ortiz stated that, with respect to the shooting, he was approximately 100 feet from the car, then stated it was 25 feet, and then 5 feet. According to Ortiz, codefendant was behind the passenger at the time of the shooting and he denied telling the police codefendant was behind the driver. Ortiz further stated that he did not observe the driver, but stated the driver was not one of the individuals involved in the fight.

Thereafter, the State presented the testimony of the two detec-

---

[3]It is presumed Ortiz meant Haas Park; Fairfield is approximately one-half block west of Washtenaw.

tives involved in defendant's initial arrest. The State then rested. Defendant moved for a judgment of acquittal, which the trial court denied. Defendant then offered testimony on his own behalf, including his own testimony. After defendant offered his evidence, the State called the two detectives involved in defendant's initial arrest in rebuttal.

After the State and defendant gave their closing arguments, the case was submitted to the jury. During the course of its deliberations, the jury sent several notes to the court. One inquired as to whether Ortiz testified through a translator from Spanish to English. It was advised that he did not. The jury also requested to review the transcripts of Detective Guevara, Ortiz, and Diaz's testimony. With respect to Guevara's testimony, the jury indicated that it wanted to verify whether he had asked defendant if he was a gang member and that defendant's response was yes, he was a member of the Pachuros gang. The jury was provided with the transcripts of Ortiz's and Diaz's testimony, but since Guevara's was not available, it was simply advised that "[t]hat was the testimony of Detective Guevara."

On March 21, the jury found defendant guilty of murder. On April 17, defendant filed a motion for a new trial, arguing, *inter alia*, that the trial court erred in admitting Ortiz's testimony, erred in refusing to allow defendant to impeach Ortiz with a robbery charge that was pending at the time of codefendant's trial, and erred in refusing to allow defendant to impeach Ortiz with a 1994 conviction for armed robbery. On April 30, during a hearing on defendant's motion, he orally moved to amend the motion to include as an error the trial court's refusal to allow his brother to testify. The trial court denied defendant's motion for a new trial. In reaching its decision, the trial court noted that if the only evidence of defendant's guilt had been Ortiz's testimony, the court would have directed a verdict in defendant's favor. However, according to the court, defendant provided it with additional evidence of his guilt: his flight and an unsuccessful alibi defense.

The court then held a sentencing hearing and, thereafter, sentenced defendant to 40 years' imprisonment. On May 14, defendant pled guilty to bail jumping. He was sentenced to 13 years' imprisonment for that offense, to run consecutive to his sentence for murder. This appeal followed.

## ANALYSIS

### *Crawford* and Section 115—10.4

■ Defendant first contends that section 115—10.4 of the Code has been rendered unconstitutional pursuant to *Crawford* since it

does not require that a defendant have had a prior opportunity to cross-examine a witness before admitting former testimony. Defendant argues that *Crawford* was violated in the instant case by the admission of Ortiz's testimony from codefendant's trial, which denied him his right to confront witnesses. Defendant also contends that admission of Ortiz's testimony was not harmless error because it contributed to his conviction since Ortiz was the sole eyewitness to identify defendant as the shooter and no other evidence connected him to the crime. The State contends that defendant forfeited his sixth amendment confrontation claim by his own wrongdoing in intentionally absenting himself from the court and engaging in an elaborate scheme to avoid the law for 10 years.

Section 115—10.4 of the Code, entitled "Admissibility of prior statement when witness is deceased," provides:

"(a) A statement not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule if the declarant is deceased and if the court determines that:

(1) the statement is offered as evidence of a material fact; and

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of this Section and the interests of justice will best be served by admission of the statement into evidence.
***

(c) Unavailability as a witness under this Section is limited to the situation in which the declarant is deceased.

(d) Any prior statement that is sought to be admitted under this Section must have been made by the declarant under oath at a trial, hearing, or other proceeding." 725 ILCS 5/115—10.4 (West 2002).[4]

In *Crawford*, the Supreme Court "overruled the long-standing reliability framework for the admissibility of out-of-court statements contained in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d. 597, 100 S. Ct. 2531 (1980)." *People v. Thompson*, 349 Ill. App. 3d 587, 593, 812 N.E.2d 516 (2004). The *Crawford* Court held that in order to satisfy the confrontation clause of the sixth amendment, testimonial statements of a witness who is not present at a defendant's trial are admis-

---

[4]An amendment to this provision, adding the following language to the end of paragraph (d), "and been subject to cross-examination by the adverse party," was approved on June 17, 2005, and became effective immediately. Pub. Act 94—0053, eff. June 17, 2005.

sible only if (1) the declarant is unavailable and (2) the defendant had an opportunity to cross-examine the witness at the time of the statement. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. *Crawford* rendered the phrases "indicia of reliability" and "particularized guarantees of trustworthiness" irrelevant to confrontational clause rights. *Crawford*, 541 U.S. at 60, 158 L. Ed. 2d at 198, 124 S. Ct. at 1369. However, the *Crawford* Court specifically noted that it continued to adhere to the rule that "forfeiture by wrongdoing" can extinguish a defendant's confrontation rights. *Crawford*, 541 U.S. at 62, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370. *Crawford* is applicable to cases pending on direct review at the time of the decision or thereafter. *Thompson*, 349 Ill. App. 3d at 594.

In the instant case, the admission of Ortiz's testimony from codefendant's trial violated *Crawford* and, thus, defendant's confrontation rights. Specifically, there can be no dispute, and the State does not argue to the contrary, that defendant did not have the opportunity to cross-examine Ortiz. Because of this, Ortiz's testimony was inadmissible at defendant's trial under the dictates of *Crawford*. However, Ortiz's testimony would have been properly admitted if defendant forfeited his confrontation challenge by his wrongdoing or the admission was harmless error.

■ The crucial question here is whether defendant forfeited, by his own misconduct in jumping bail, his confrontational rights with respect to Ortiz, which would deprive him of his right to challenge the admission of Ortiz's testimony. The determination of this question depends upon adoption and interpretation of the forfeiture by wrongdoing rule.[5] The forfeiture by wrongdoing doctrine was first enunciated by the United State Supreme Court in *Reynolds v. United States*, 98 U.S. 145, 25 L. Ed. 244 (1878). In *Reynolds*, when police attempted to serve the defendant's second wife with a subpoena to testify against him at his bigamy trial, the defendant refused to reveal her presence. *Reynolds*, 98 U.S. at 159, 25 L. Ed. at 248. The district court concluded that the defendant procured her absence and allowed admission of her testimony from a prior bigamy trial as evidence against the defendant. *Reynolds*, 98 U.S. at 158-60, 25 L. Ed. at 247-48. On appeal, the defendant argued that he was denied his right of confrontation by the admission of his second wife's testimony. The Court

---

[5]We note, as the State indicates, that a case is currently pending before the Illinois Supreme Court that is expected to address the forfeiture by wrongdoing doctrine in relation to *Crawford*. *People v. Stechly*, No. 97544 (2005). This case was oralled before the supreme court on September 13 and, as of November 3, is on the advisement docket.

disagreed. In reaching its conclusion, the Supreme Court relied on language from a 1666 British case, *Lord Morley's Case*, 6 Howell, State Trials 770 (1666): the witness was " 'detained by the means or procurement of the prisoner.' " *Reynolds*, 98 U.S. at 158, 25 L. Ed. at 247, quoting *Lord Morley's Case*, 6 Howell, State Trials at 771. The Court further relied on language from another case where evidence was admitted in the witness's absence because "the prisoner had resorted to contrivance to keep a witness out of the way." *Reynolds*, 98 U.S. at 158, 25 L. Ed. at 247. The Court then noted that other courts had implemented the principle of forfeiture and all had found or implied that "the witness must have been wrongfully kept away." *Reynolds*, 98 U.S. at 159, 25 L. Ed. at 248. The foundation for the rule, according to the Court, was that "no one shall be permitted to take advantage of his own wrong" and it was based upon "common honesty." *Reynolds*, 98 U.S. at 159, 25 L. Ed. at 248. In light of these principles, the Supreme Court found:

> "The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful *procurement*, he cannot complain if competent evidence is admitted to supply the place of that which *he has kept away*. The Constitution does not guarantee an accused person against the *legitimate consequences* of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if *he voluntarily keeps the witnesses away*, he cannot insist on his privilege. If, therefore, when absent by his *procurement*, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." (Emphasis added.) *Reynolds*, 98 U.S. at 158, 25 L. Ed. at 247.

The Court concluded that enough evidence had been proven to place the burden on the defendant to show "that he had not been instrumental in concealing or keeping the witness away" and that he had a "full opportunity [at his trial] to account for the absence of the witness, if he would, or to deny under oath that he had kept her away." *Reynolds*, 98 U.S. at 160, 25 L. Ed. at 248. However, the defendant failed to do so. Accordingly, the Court concluded that the defendant, by procuring the witness's absence, could not complain that his constitutional rights had been violated and held that the admission of the testimony was proper. *Reynolds*, 98 U.S. at 160, 25 L. Ed. at 248.

By the 1970s, federal courts of appeal had begun to adopt the doctrine, including the Second, FIfth, Sixth, Eighth, Tenth, and Eleventh Circuits. See *Commonwealth v. Edwards*, 444 Mass. 526, 533, 830 N.E.2d 158, 166 (2005) (citing cases). Because the forfeiture

by wrongdoing rule had become so well accepted, in 1997, it was codified in Federal Rule of Evidence 804(b)(6) (Fed. R. Evid. 804(b)(6)).[6] The rule was promulgated to "attempt to respond to the problem of witness intimidation whereby the criminal defendant [through one means or another] *** procures the unavailability of the witness at trial and thereby benefits from the wrongdoing by depriving the trier of fact of relevant testimony." 3 M. Graham, Handbook of Federal Evidence § 804.6, at 590 (5th ed. 2001); *United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002) (the doctrine is based upon equitable principles and "[t]he primary reasoning behind this rule is obvious—to deter criminals from intimidating or 'taking care of' potential witnesses against them"); *United States v. Scott*, 284 F.3d 758, 763-64 (7th Cir. 2002) (same quote as *Graham*); *Edwards*, 444 Mass. at 535, 830 N.E.2d at 167 (the rule serves "to protect witnesses from intimidation, pressure, threats, and even physical harm" "by discouraging untoward behavior toward witnesses by defendants"). In other words, the rule is based upon public policy to protect " 'the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness.' [Citation.]" *Edwards*, 444 Mass. at 535, 830 N.E.2d at 167; *People v. Straker*, 173 Misc. 2d 949, 955, 662 N.Y.S.2d 166, 169 (Sup. Ct. 1997) (same). More specifically, the rule is justified " 'by the public policy of reducing the incentive to tamper with witnesses.' [Citations.]" *Straker*, 173 Misc. 2d at 955, 662 N.Y.S.2d at 170. This exception "is essential because it discourages defendants from killing, kidnapping, secreting, terrorizing, blackmailing, or conspiring with critical witnesses so that they become unavailable to testify." *State v. Hale*, 277 Wis. 2d 593, 622, 691 N.W.2d 637, 652 (2005) (Prosser, J., concurring). As stated above, the Court in *Crawford* specifically noted that it continued to adhere to the forfeiture by wrongdoing doctrine. *Crawford*, 541 U.S. at 62, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370.

No Illinois case has adopted Rule 804(b)(6) and, likewise, our independent research has not disclosed any Illinois case that has addressed the forfeiture by wrongdoing rule. However, based upon the public policy underlying the rule and the fact it has been accepted by every jurisdiction that has considered it, we, too, believe that the forfeiture by wrongdoing rule should be part of Illinois law. We must therefore define the scope of the doctrine.

---

[6]Federal Rule of Evidence 804(b)(6) provides as admissible as evidence: "A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6). Our independent research has disclosed no case in Illinois that has adopted this provision.

Whether certain acts are considered "misconduct" or "wrongdoing" has not generally been an issue because the acts in question have been serious criminal acts such as assault or murder of a witness. See, *e.g.*, *United States v. Garcia-Meza*, 403 F.3d 364 (6th Cir. 2005); *United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001); *United States v. White*, 116 F.3d 903 (D.C. Cir. 1997); *United States v. Rouco*, 765 F.2d 983 (11th Cir. 1985); *United States v. Mastrangelo*, 693 F.2d 269 (2d Cir. 1982); *United States v. Houlihan*, 92 F.3d 1271 (1st Cir. 1996); *Bryant v. Folino*, No. Civ. A. 04—3921 (E.D. Pa. March 21, 2005); *United States v. Rivera*, 292 F. Supp. 2d 827 (E.D. Va. 2003); *United States v. Colon-Miranda*, 992 F. Supp. 82 (D.P.R. 1997); *People v. Moore*, 117 P.3d 1, 5 (Colo. App. 2004); *State v. Henry*, 76 Conn. App. 515, 820 A.2d 1076 (2003); *State v. Meeks*, 277 Kan. 609, 615-16, 88 P.3d 789, 794-95 (2004); *State v. Fields*, 679 N.W.2d 341, 347 (Minn. 2004); *Gonzalez v. State*, 155 S.W.3d 603, 610-11 (Tex. App. 2004) (witnesses murdered). Moreover, threats, intimidation, and chicanery directed at a witness, as well as " 'persuasion and control by a defendant, the wrongful nondisclosure of information, and a defendant's direction to a witness to exercise the fifth amendment privilege' [citations]" have also been found to constitute wrongdoing sufficient to invoke the doctrine. *State v. Hallum*, 606 N.W.2d 351, 356 (Iowa 2000). See also *Scott*, 284 F.3d 758; *People v. Pace*, 300 A.D.2d 1071, 752 N.Y.S.2d 489 (2002); *People v. Geraci*, 85 N.Y.2d 359, 649 N.E.2d 817, 625 N.Y.S.2d 469 (1995) (witnesses threatened). See also *Scott*, 284 F.3d at 763-64 (noting that the rule "contemplates application against the use of coercion, undue influence, or pressure to silence testimony"); *Henry*, 76 Conn. App. at 532, 820 A.2d at 1086 ("[I]f a witness' silence is procured by the defendant himself, whether by chicanery [citation], by threats [citations], or by actual violence or murder [citation], the defendant cannot assert his confrontation clause rights" to prevent prior testimony from being admitted against him). Collusion with a witness has also been held to constitute wrongdoing sufficient to invoke the forfeiture by wrongdoing rule. See *Edwards*, 444 Mass. at 539, 830 N.E.2d at 170.

We find, based upon the above cases along with the specific language used by the *Reynolds* Court, that a defendant must engage in some sort of wrongful conduct *vis-à-vis* a witness, not merely wrongful conduct in general. The State has not cited and our independent research has not disclosed any case in which the defendant's conduct was not aimed directly at the witness. From the cases cited above, the conduct in question was certainly directed at the witnesses. Moreover, the terms utilized by the *Reynolds* Court connote conduct in relation to a witness. The Court used the term "procurement." "Procure" is

defined as "to cause a thing to be done; to instigate; to contrive, bring about, effect, or cause. To persuade, induce, prevail upon, or cause a person to do something. *** Procure connotes action and means to cause, *** bring about, cause to be done." Black's Law Dictionary 1087 (5th ed. 1979). "Procurer" is defined as "One who prevails upon, induces or persuades a person to do something." Black's Law Dictionary 1087 (5th ed. 1979). Certainly, these definitions intimate some action on the part of a defendant *vis-à-vis* a witness. This conclusion is further supported by the rationale underlying the rule itself, as detailed above. Clearly, the rule is aimed to protect witnesses from improper behavior and conduct by a defendant. See, *e.g.*, *Hallum*, 606 N.W.2d at 356 ("the nature of the defendant's conduct is not as important as the effect of that conduct on the witnesses's willingness to testify at trial").

The State argues that the forfeiture by wrongdoing doctrine as set forth in Rule 804(b)(6) narrowly defines the rule and requires an element of intent or motive to procure the witness's unavailability, whereas the equitable doctrine espoused by *Crawford* through its reliance on *Reynolds* broadly defines the rule and does not require an element of intent or motive. According to the State, the two doctrines are not interchangeable and we should not impose an intent requirement. We disagree. We initially note that it is not clear whether the Court in *Reynolds* considered the intent or motive of the defendant irrelevant. Although the Court did not use the term "intent," a logical inference can be made from its decision that the defendant's motive, at least in part, was relevant, *i.e.*, the defendant did not disclose his second wife's whereabouts or explain her absence because he wanted to keep her away from his trial so she could not testify against him for a second time. The Court noted that defendant had a full opportunity to explain her absence or deny his involvement in keeping her away from his trial, but failed to do so. From this, it seems logical to infer that the defendant's motive was, at least in part, relevant. In any event, even assuming intent or motive was not required by *Reynolds*, we find that the intent or motive of a defendant in engaging in the conduct he does is relevant to whether the forfeiture by wrongdoing rule is invoked. There is no question that intent is required under Rule 804(b)(6) and, thus, the federal courts apply the rule to situations where a defendant's purpose is to prevent the witness's testimony. *United States v. Gray*, 405 F.3d 227, 242 n.9 (4th Cir. 2005) (stating that Rule 804(b)(6) applies only "to those cases in which the defendant intended, at least in part, to render the declarant unavailable as a witness against him" and, "[a]bsent such intent, Rule 804(b)(6) has no application"). See also *Houlihan*, 92 F.3d at 1279; *United States v. Thevis*, 665 F.2d 616,

630 (5th Cir. 1982); *United States v. Carlson*, 547 F.2d 1346, 1359 (8th Cir. 1976).

Our research has disclosed that a majority of the state jurisdictions addressing this question require that a defendant have the intent to procure the witness's unavailability or be motivated by the desire to prevent the witness from testifying. See *Henry*, 76 Conn. App. at 537-39, 820 A.2d at 1086-89 (relying on Federal Rules of Evidence as incorporating the common law); *State v. Charbonneau*, 2003 WL 22232811[7] (Del. Super. 2003) (unpublished)[8] (citing Del. R. Evid. 804(b)(6), which tracks the federal rule); *Devonshire v. United States*, 691 A.2d 165, 168 (D.C. App. 1997) (adopting the forfeiture by wrongdoing rule and stating that "[a]ll federal and state courts that have addressed this issue *** have concluded that when a defendant procures a witness's unavailability for trial with the purpose of preventing the witness from testifying, the defendant waives his rights under the Confrontation Clause to object to the admission of the absent witness's hearsay statements," citing *Reynolds*); *Edwards*, 444 Mass. at 540, 830 N.E.2d at 170 (requiring a showing that "the defendant acted with the intent to procure the witness's unavailability); *State v. Wright*, 701 N.W.2d 802, 815 (Minn. 2005) (citing *Crawford* and noting that Minnesota has consistently applied the forfeiture by wrongdoing rule since at least 1980, but requires proof that the defendant intended to procure the witness's unavailability and that his conduct did, in fact, procure the witness's unavailability); *State v. Alvarez-Lopez*, 136 N.M. 309, 314, 98 P.3d 699, 704 (2004) (holding that the State must show that the defendant intended or was motivated in part to procure a witness's unavailability); *State v. Wiggins*, Nos. 99 CRS 46567, 99 CRS 46569, 99 CRS 50145, 99 CRS 100006 (N.C. Sup. Ct. March 18, 2005) (unpublished) (stating that there was no evidence that the defendant's conduct was motivated in whole or in part by a desire to prevent the witness from testifying and, therefore, the forfeiture by wrongdoing rule was not applicable); *State v. Boyes*, Nos. 2003CA0050, 2003CA0051 (Ohio App. June 21, 2004) (unpublished) (citing state evidence rule, Evid R. 804(B)(6), that was patterned after Rule 804(b)(6)); *Commonwealth v. Santiago*, 822 A.2d 716, 729-30 (Pa. Super. 2003) (state evidence rule adopted that is the same as Rule 804(b)(6)); *State v. Ivy*, No. W2003—00786—CCA—R3—DD (Tenn. App. December 30, 2004) (unpublished) (citing Ten-

---

[7]This case, as reported on Westlaw, has no docket or court number.

[8]While we acknowledge that unpublished decisions are not precedential and generally should not be cited, we have, however, included them by way of example and for indicating the diversity within jurisdictions.

nessee Rule of Evidence 804(B)(6) that is the same as Rule 804(b)(6)). Intent can also be inferred to be a requirement in decisions from three other states. *Moore*, 117 P.3d at 5 (although not addressing the issue because the defendant killed the witness and, thus, made the witness unavailable, the court relied on Connecticut case law); *Hallum*, 606 N.W.2d at 358 (the defendant encouraged and influenced his brother into not testifying against the defendant); *Straker*, 173 Misc. 2d at 957, 662 N.Y.S.2d at 171 (the defendant intimidated and bribed the witness not to testify). *Cf. People v. Ayrhart*, 8 Misc. 3d 1014(A), 801 N.Y.S.2d 779 (N.Y. County Ct. June 30, 2005) (Table) (unpublished) (requiring a showing that the defendant was responsible for the witness's unavailability and that he was motivated by a desire to prevent the witness from giving testimony).

The only state case we have discovered to the contrary is *Gonzalez*. The defendant was on trial for capital murder and the State sought to introduce the murder victim/witness's statement to the police regarding the identity of her shooter, which she made prior to her death. *Gonzalez*, 155 S.W.3d at 606-07. The defendant argued that admission of these statements denied him his right to confront witnesses. *Gonzalez*, 155 S.W.3d at 605. The court disagreed, finding that the defendant forfeited his confrontation rights under the forfeiture by wrongdoing doctrine. *Gonzalez*, 155 S.W.3d at 610. The *Gonzalez* court relied upon *Reynolds* and a California case, *People v. Giles*, 123 Cal. App. 4th 475, 488, 19 Cal. Rptr. 3d 843, 851 (2004) (holding that if the witness cannot testify because the defendant murdered her, then the defendant is deemed to have forfeited his confrontation rights, even though the act he is charged with is the same act that caused the witness's unavailability). *Gonzalez*, 155 S.W.3d at 610. Although the defendant in *Gonzalez* argued that "a defendant forfeits a Confrontation Clause objection through wrongdoing only when he is charged with or is under investigation for a crime, and wrongfully procures the witness's absence from trial with the intent of preventing the witness from testifying about that crime," the court disagreed. *Gonzalez*, 155 S.W.3d at 610. The court found that there was no reason why the forfeiture by wrongdoing doctrine should be limited to such cases, relying on *Giles*. *Gonzalez*, 155 S.W.3d at 610. Specifically, the court held:

> "A defendant whose wrongful act renders a witness unavailable for trial benefits from his conduct if he can use the witness's unavailability to exclude otherwise admissible hearsay statements. This is true whether or not the defendant specifically intended to prevent

the witness from testifying at the time he committed the act that rendered the witness unavailable." *Gonzalez*, 155 S.W.3d at 611.[9]

The State also relies on *Garcia-Meza* (as well as an unpublished case from California) to support its argument that intent/motive is irrelevant to whether the forfeiture by wrongdoing doctrine is applicable. In *Garcia-Meza*, the defendant was on trial for murdering his wife. He objected to the introduction of her hearsay statements to the police that the defendant had beaten her up because she had been talking to an old boyfriend on the ground that such admission would violate his right to confront witnesses. *Garcia-Meza*, 403 F.3d at 369. The court concluded that the defendant had forfeited his right to object to the lack of confrontation because his wrongful conduct was responsible for her unavailability. *Garcia-Meza*, 403 F.3d at 370. In other words, by killing the witness/his wife, the defendant procured her unavailability. In rejecting the defendant's argument that the forfeiture by wrongdoing doctrine was not applicable because he did not kill his wife with the specific intent to prevent her from testifying, the court stated:

> "Though the Federal Rules of Evidence may contain such a requirement ***, the right secured by the Sixth Amendment does not depend on, in the recent words of the Supreme Court, 'the vagaries of the Rules of Evidence.' [Citation.] The Supreme Court's recent affirmation of the 'essentially equitable grounds' for the rule of forfeiture strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive." *Garcia-Meza*, 403 F.3d at 370.

The *Garcia-Meza* court relied upon *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), where the court held that "if *** the witness is only unavailable to testify because the defendant has killed or intimidated her, then the defendant has forfeited his right to confront that witness." *Cromer*, 389 F.3d at 679. See also *United States v. Mayhew*, 380 F. Supp. 2d 961, 966-67 (S.D. Ohio 2005) (relying on *Garcia-Meza* and finding that because the defendant killed the witness, even absent an intent to prevent her from testifying, he had forfeited his right to confront the witness).

We do not find these cases controlling. The situation presented in each of them is unique: a defendant is on trial for murder of the actual witness whose out-of-court testimony the prosecution wishes to present and the defendants have argued that the forfeiture by wrongdoing doctrine only applies when a defendant is charged or is under investigation for a crime and wrongfully procures a witness's

---

[9]*Gonzalez* has not subsequently been cited or relied upon for this proposition.

absence from trial with the intent of preventing testimony about that crime. Clearly, in these situations a defendant should not be allowed to escape the forfeiture by wrongdoing based on his or her motive in killing the victim. Such a rule is certainly logical; otherwise, defendants would be able to profit from their own wrongdoing. " '[W]hen confrontation becomes impossible due to the actions of the very person who would assert the right, logic dictates that the right has been waived.' [Citation.]" *Devonshire*, 691 A.2d at 168. Moreover, this rule has only been applied in the situation described above. We have discovered no case in which it was applied where the defendant was not on trial for killing the individual whose testimony the prosecution sought to admit. Accordingly, we do not find that these cases support a general rule that a defendant's intent or motive with respect to his conduct toward a witness is irrelevant in determining whether the forfeiture by wrongdoing rule is applicable. We find that based upon the prevailing view, in situations other than the unique situation detailed above, the intent or motive of a defendant in engaging in the conduct he does is relevant to whether the forfeiture by wrongdoing rule is invoked.

Lastly, we find that there must be a causal connection between the defendant's conduct and the witness's unavailability. Courts have refused to apply the rule when there is no evidence that the defendant was responsible for the loss of the witness or where the State is unable to link the defendant to the witness's unavailability. See, *e.g.*, *Motes v. United States*, 178 U.S. 458, 471, 44 L. Ed. 1150, 1155, 20 S. Ct. 993, 998 (1900) ("We are of [the] opinion that the admission in evidence of [the witness's] statement or deposition taken at the examining trial was in violation of the constitutional right of the defendants to be confronted with the witnesses against them. It did not appear that [the witness] was absent from the trial by the suggestion, procurement, or act of the accused"); *United States v. Hendricks*, Crim. No. 2004-05 F/R (D.V.I., St. Croix April 27, 2004) (the forfeiture by wrongdoing rule was not applicable where the government was unable to connect the defendant to the witness's murder); *Giles*, 123 Cal. App. 4th at 487, 19 Cal. Rptr. 3d at 850 ("it is not enough to commit some act that incidentally produces that result [rendered a witness unavailable]"); *Hallum*, 606 N.W.2d at 356 ("the nature of the defendant's conduct is not as important as the effect of that conduct on the witnesses' willingness to testify at trial"); *Edwards*, 444 Mass. at 540, 830 N.E.2d at 170 (the Commonwealth must demonstrate that the defendant "was involved in, or responsible for, procuring the unavailability of the witness," and here, the evidence demonstrated that the defendant "played a meaningful role in procuring" the

witness's unavailability). See also K. Graham, *Accomplice Confessions and the Confrontation Clause: Crawford v. Washington Confronts Past Issues With a New Rule*, 32 Pepp. L. Rev. 315, 361 n.319 (2005) ("If a key witness made non-cross-examined hearsay statements that were crucial to convicting the defendant, but the witness suddenly disappeared or died before trial without the prosecution's ability to show that the defendant caused his unavailability, the prosecution is automatically precluded from using the hearsay statements, no matter how reliable they may be"). In *Edwards*, the court stated, with respect to a defendant's conduct:

> "Certainly, a defendant must have contributed to the witness's unavailability in some significant manner. However, the causal link necessary between a defendant's actions and a witness's unavailability may be established where (1) a defendant puts forward to a witness the idea to avoid testifying, either by threats, coercion, persuasion, or pressure; (2) a defendant physically prevents a witness from testifying; or (3) a defendant actively facilitates the carrying out of the witness's independent intent not to testify." *Edwards*, 444 Mass. at 541, 830 N.E.2d at 171.

Thereafter, the court reiterated that

> "there must be some causal connection between the defendant's actions and the witness's ultimate unavailability. The method by which the witness becomes unavailable must, at the very least, be a logical outgrowth or foreseeable result of the collusion." *Edwards*, 444 Mass. at 541, 830 N.E.2d at 171.

In *Giles*, the court gave the following as an example of when a defendant's conduct, although causing the witness's unavailability, is not sufficient to invoke the forfeiture by wrongdoing rule. If the witness had died as a result of an automobile accident in which the defendant was the driver, that defendant "would have been the technical cause of [the witness's] unavailability at any future trial, but his actions could not be construed as a forfeiture of his right to confront her as a witness." *Giles*, 123 Cal. App. 4th at 487, 19 Cal. Rptr. 3d at 850.

■ With the above principles we have established in mind, we must determine whether defendant's conduct here falls within the ambit of the forfeiture by wrongdoing rule. Although the State argues that the forfeiture by wrongdoing exception applies based on defendant's bail jumping and flight, it cites no cases where the rule has been applied in such a situation. However, with respect to whether "absconding" from prosecution constitutes wrongdoing to invoke the rule, defendant cites a case directly on point in his reply brief, *Alvarez-*

*Lopez*, although from another jurisdiction.[10] In *Alvarez-Lopez*, the defendant and his accomplice burglarized a home in April 1993 and were indicted shortly thereafter. *Alvarez-Lopez*, 136 N.M. at 312, 98 P.3d at 702. The defendant's trial was scheduled for December 1993, at which time the accomplice had pled guilty and was serving his sentence. The accomplice had been subpoenaed for the defendant's trial. *Alvarez-Lopez*, 136 N.M. at 313, 98 P.3d at 703. However, the defendant absconded, failing to appear for his trial, and was a fugitive for seven years until July 2000. *Alvarez-Lopez*, 136 N.M. at 312, 98 P.3d at 702. At the defendant's trial in late 2000, because the accomplice had been deported to Mexico, the statements he had made to the police while in custody that implicated the defendant were admitted against the defendant. *Alvarez-Lopez*, 136 N.M. at 312, 98 P.3d at 702. Thereafter, the defendant was convicted of, *inter alia*, aggravated burglary. *Alvarez-Lopez*, 136 N.M. at 311, 98 P.3d at 701. On appeal, the appellate court concluded that the admission of the accomplice's statement did not violate the defendant's sixth amendment right to confrontation. *Alvarez-Lopez*, 136 N.M. at 311, 98 P.3d at 701.

During the pendency of the *Alvarez-Lopez* appeal to the New Mexico Supreme Court, *Crawford* was decided and the parties were required to file supplemental briefs addressing that decision. *Alvarez-Lopez*, 136 N.M. at 312, 98 P.3d at 702. The State's position was that the defendant forfeited his constitutional right to confront by absconding. *Alvarez-Lopez*, 136 N.M. at 312, 98 P.3d at 702. The *Alvarez-Lopez* court held that he did not. *Alvarez-Lopez*, 136 N.M. at 312, 98 P.3d at 702. Specifically, the court held that "under *Crawford*[,] the district court erred in admitting into evidence testimonial statements made by an accomplice inculpating Defendant" and the error in doing so was not harmless. *Alvarez-Lopez*, 136 N.M. at 312, 98 P.3d at 702. In so holding, the *Alvarez-Lopez* court first recognized that "Rule 804(b)(6) is a federal rule of evidence that has not been adopted into our rules of evidence; however, we are bound to apply federal law in determining the minimum level of a criminal defendant's constitutional right to confrontation." *Alvarez-Lopez*, 136 N.M. at 314, 98 P.3d at 704. In finding that the defendant had not forfeited his right of confrontation by absconding, the court noted that the State's argument was "based on the fact that if Defendant had not absconded, [the accomplice] would have been available to testify at Defendant's trial in 1993." *Alvarez-Lopez*, 136 N.M. at 314, 98 P.3d at 704. However, the *Alvarez-*

---

[10]Our independent research has disclosed no other cases addressing the precise question of whether flight constitutes wrongdoing for purposes of the forfeiture by wrongdoing rule.

*Lopez* court disagreed based on its construction of "causation in light of the language used in the federal rule," specifically, that a defendant must commit a " 'wrongdoing that was intended to, and did, *procure* the unavailability of the declarant as a witness.' [Citation.]" (Emphasis in original.) *Alvarez-Lopez*, 136 N.M. at 314, 98 P.3d at 704. According to the *Alvarez-Lopez* court, the defendant's "absconding did not in any way 'procure' [the accomplice's] deportation to Mexico." *Alvarez-Lopez*, 136 N.M. at 314, 98 P.3d at 704. Although the court noted that the deportation "may, in some indirect and attenuated sense, have been a consequence of Defendant having absconded, that is not a sufficient causal relationship to satisfy the [forfeiture by wrongdoing] rule." *Alvarez-Lopez*, 136 N.M. at 314, 98 P.3d at 704.

The *Alvarez-Lopez* court further concluded that the State failed to show that the defendant "absconded with the specific intent of preventing [the accomplice] from testifying." *Alvarez-Lopez*, 136 N.M. at 315, 98 P.3d at 705. Although the court did state that "[i]t may be sufficient to infer under certain facts that a defendant intended by his misconduct to prevent the witness from testifying," *i.e.*, when a witness is murdered, "we have no basis to infer anything about Defendant's motive in absconding and remaining a fugitive, other than the self-evident fact that he fled from the likely consequences of a successful criminal prosecution." *Alvarez-Lopez*, 136 N.M. at 315, 98 P.3d at 705. Lastly, the court noted that "[o]ne of the primary purposes of the forfeiture by wrongdoing rule is 'to deter criminals from intimidating or "taking care of" potential witnesses.' [Citation.] [But] [w]ithout a showing that Defendant intentionally prevented [the accomplice] from being a witness against him, this purpose is not served by admitting the testimony." *Alvarez-Lopez*, 136 N.M. at 315, 98 P.3d at 705. Accordingly, the *Alvarez-Lopez* court held that the State failed to establish the defendant forfeited his right to confront the accomplice. *Alvarez-Lopez*, 136 N.M. at 315, 98 P.3d at 705.

Although the State maintains that *Alvarez-Lopez* was erroneously decided because the court based its decision on faulty reasoning, *i.e.*, that it was bound by federal laws, presumably Rule 804(b)(6), rather than the equitable doctrine espoused by *Reynolds*, we disagree for the reasons detailed above, *i.e.*, that intent is relevant to the question of whether the forfeiture by wrongdoing doctrine is applicable. As such, we find *Alvarez-Lopez* persuasive and reach the same conclusion here. Although defendant's flight was reprehensible and showed a complete disrespect for the court and the administration of justice, we do not find it constitutes wrongdoing sufficient to invoke the forfeiture by wrongdoing rule. First, defendant did not threaten, coerce, pressure, intimidate, persuade or control, collude with, or direct Ortiz to exercise

his fifth amendment right, nor did defendant wrongfully nondisclose information regarding Ortiz. Clearly, defendant did not engage in any violence with respect to Ortiz. Although the State argues that the conduct in question here is much worse than the conduct in *Reynolds*, it ignores there was a direct act by the defendant in *Reynolds vis-à-vis* the witness. Specifically, the defendant in *Reynolds* refused to disclose the location of the witness. In other words, he engaged in some definite act in connection with or relationship to the witness's ability to be located, and thus, present, that resulted in her absence. There is no such conduct on the part of defendant here. Clearly, defendant's conduct was not directed at Ortiz.

Moreover, we find that the requisite intent was not established. There is no evidence that defendant left or remained a fugitive with the intent to procure Ortiz's unavailability nor that he was motivated by a desire to prevent Ortiz from testifying. Similarly, there is no evidence, and there can be no logical inference, that defendant remained a fugitive in hopes of Ortiz dying. This is particularly true given the fact Ortiz was only 16 or 17 years old at the time—not 80 or 90.

Lastly, we find that the requisite causal connection was not established. Defendant's flight did not procure Ortiz's unavailability to testify. There is no connection between defendant's flight and Ortiz's death from a drug overdose. Rather, defendant's conduct was merely an act that incidentally rendered Ortiz unavailable. Likewise, Ortiz's death from a drug overdose is not a logical outgrowth, foreseeable result, or legitimate consequence of defendant's flight.

Based on the foregoing, we find that the admission of Ortiz's testimony at defendant's trial violated his sixth amendment confrontation rights, as espoused in *Crawford*, and that defendant's conduct in escaping prosecution for 10 years did not constitute misconduct sufficient to invoke the forfeiture by wrongdoing rule. Thus, the question becomes whether the admission of Ortiz's testimony was harmless error. See *People v. Miles*, 351 Ill. App. 3d 857, 867, 815 N.E.2d 37 (2004); *Thompson*, 349 Ill. App. 3d at 594-95; *People v. Patterson*, 347 Ill. App. 3d 1044, 1051, 808 N.E.2d 1159 (2004) (all applying a harmless error analysis to alleged violations of *Crawford*).

There are three approaches for determining whether an error was harmless beyond a reasonable doubt: "(1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) determining whether the evidence is cumulative or merely duplicates properly admitted evidence." *Thompson*, 349 Ill. App. 3d at 594. Here, Ortiz provided

testimony establishing defendant as the shooter. Ortiz was the sole eyewitness to identify defendant as the shooter. As such, the testimony was not cumulative or duplicative. Moreover, because it was the only identification testimony, there is a reasonable probability that Ortiz's testimony contributed to defendant's conviction. See *Thompson*, 349 Ill. App. 3d at 594-95. In addition, the evidence in this case was not overwhelming. Ortiz was the only individual to connect defendant in any manner to the crime. There was no physical evidence or other circumstantial evidence (with the exception of Paulnitsky's lineup identification testimony and defendant's flight, both discussed below) connecting defendant to Botello's murder. Accordingly, we find that the error in admitting Ortiz's testimony into evidence was not harmless beyond a reasonable doubt and we reverse defendant's conviction and remand this cause for a new trial.

Since we are remanding this cause for a new trial, we must consider whether the evidence was sufficient to sustain a conviction beyond a reasonable doubt for double jeopardy purposes. *Thompson*, 349 Ill. App. 3d at 595. The rules with respect to double jeopardy analysis are well-settled. As stated in *People v. Olivera*, 164 Ill. 2d 382, 647 N.E.2d 926 (1995):

> "The double jeopardy clause forbids a second, or successive, trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding. [Citation.] \*\*\* [F]or purposes of double jeopardy the United States Supreme Court has distinguished between judgments reversing convictions on account of trial error and judgments reversing convictions on account of evidentiary insufficiency. Reversal for trial error is a determination that the defendant has been convicted by means of a judicial process defective in some fundamental respect, whereas reversal for evidentiary insufficiency occurs when the prosecution has failed to prove its case, and the only proper remedy is a judgment of acquittal. [Citation.] Although the double jeopardy clause precludes the State from retrying a defendant after a reviewing court has determined that the evidence introduced at trial was legally insufficient to convict, the double jeopardy clause does not preclude retrial of a defendant whose conviction has been set aside because of an error in the proceedings leading to the conviction. [Citation.] Moreover, retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." *Olivera*, 164 Ill. 2d at 393.

Upon careful review of the evidence, we find the evidence

presented was sufficient to support defendant's conviction and that a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. *Thompson*, 349 Ill. App. 3d at 595. However, we note that we make no determination as to defendant's guilt or innocence that would be binding upon retrial, only that the evidence was sufficient to support defendant's conviction and retrial is not barred on double jeopardy grounds.

## CONCLUSION

For the reasons stated, we reverse defendant's conviction and vacate his sentence, and remand this cause for a new trial.

Reversed and remanded.

WOLFSON and GARCIA, JJ., concur.