No. 2--03--1276                    Filed:  3/31/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 01--CF--1783 |
| WILLARD H. PURCELL, | ) ) | Honorable Rosemary Collins, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BYRNE delivered the opinion of the court:

Barbara Purcell reported that her husband, defendant, Willard H. Purcell, attacked her with a stun gun, and the trial court entered an ex parte order of protection barring defendant from having contact with Barbara or the marital residence.  Six days later, the police discovered Barbara's bloody body in the home.  A jury found defendant guilty of three counts of first-degree murder.  The trial court merged the convictions and sentenced defendant to one term of natural life imprisonment.

This appeal focuses on the trial court's admission of prior statements made by two declarants who were deceased, and thus unavailable, at trial: (1) Barbara, the murder victim, who reported defendant's alleged stun gun attack to her physician and a police officer

and (2) Tom Vaccaro, the Purcells' next-door neighbor, who spoke with defendant on the days leading up to Barbara's death.

On appeal, defendant argues that the admission of the statements violated his rights under the confrontation clause of the sixth amendment (U.S. Const., amend VI), as recently set forth in Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). Crawford holds that the "testimonial" hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The State responds that (1) even if Crawford gave defendant the right to exclude Barbara's statements from trial, defendant forfeited this right through his violent wrongdoing of murdering her, and (2) any error in admitting Vaccaro's statements was harmless beyond a reasonable doubt. We conclude that, although the trial court erred in admitting the challenged statements, the error was harmless beyond a reasonable doubt. Further, we reject defendant's argument that his life sentence is excessive. We affirm the judgment, accordingly.

FACTS

The appellate record is voluminous, and we set forth only those facts necessary to the disposition. Defendant allegedly attacked Barbara with a stun gun in the marital residence in Rockford at 6:40 a.m. on May 31, 2001. Six hours after the attack, Barbara reported the incident while seeking the assistance of Deputy John Perry of the Winnebago County sheriff's department; she also reported the incident to her physician, Dr. Christine Petty, at 2:45 that day. Barbara was granted a two-week order of protection against defendant. Defendant was initially charged with domestic battery (720 ILCS 5/12--3.2(a)(2)

(West 2004)) and unlawful use of weapons (720 ILCS 5/24--1 (West 2004)) for the stun gun attack, but this appeal does not involve that incident.

Barbara died on June 5, 2001, and defendant was charged with three counts of first-degree murder. The parties filed opposing motions in limine regarding the admissibility of Barbara's out-of-court statements to Dr. Petty and Deputy Perry. The State argued that Barbara's statements were admissible under the excited utterance exception to the hearsay rule. The trial court orally commented that Dr. Petty's testimony was admitted under the treating-physician exception to the rule barring hearsay, but it is unclear whether the court intended to admit the testimony solely on that basis. The court admitted Deputy Perry's testimony as evidence of Barbara's state of mind, because her statements were relevant to defendant's claims of provocation and self-defense. However, it appears that the court did not instruct the jury to consider Deputy Perry's testimony for a limited purpose. We note that the parties have provided no citation to the record to explain the trial court's bases for admitting Barbara's statements.

Before trial, the parties also disputed the admissibility of the grand jury testimony of Vaccaro, who encountered defendant outside the Purcell home in violation of the order of protection. The State argued that the testimony was admissible under section 115--10.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115--10.4 (West 2004)). The trial court admitted the relevant portions of Vaccaro's testimony.

The murder trial commenced on July 8, 2003, which was more than two years after Barbara's death. Deputy Perry and Dr. Petty testified to their involvement in Barbara's report of the stun gun attack five days before her death. Deputy Perry testified that, at 12:23 p.m. on May 31, 2001, he met with Barbara at the police station. Visibly upset,

Barbara told him that at 6:40 a.m. that morning she was leaving her house through the door connecting the kitchen to the garage when defendant stepped out from behind the door, knocked her to the ground, and shot her in the neck and arm with a stun gun. As he did so, defendant demanded to know why she had a cellular phone and why she would not speak with him. Barbara stood up and walked to her car while defendant asked her to return later to talk. Barbara went to work and later notified Deputy Perry. Barbara told Deputy Perry that defendant correctly suspected she was having an extramarital affair. The trial court introduced Deputy Perry's photos of Barbara's neck and arm, taken on the day of her report. The photos show red marks and other discoloration of Barbara's skin. Deputy Perry arrested defendant at his home, and the officer searched for a stun gun but did not find one.

Deputy Perry transported defendant to the police station and served him with an order of protection that Barbara had obtained earlier that day. The order, which was in effect from May 31 to June 14, awarded Barbara exclusive possession of the marital residence and barred defendant from having any contact with her or the residence. Defendant was charged with domestic battery and unlawful use of weapons, in connection with the stun gun attack.

Dr. Petty testified that, during a hospital visit at 2:45 p.m. on May 31, 2001, Barbara reported that her husband stunned her in the neck and arm with a stun gun earlier that day. Barbara was hysterical, crying, and otherwise very upset. Barbara said that the attack knocked her to the ground, but she escaped and went to work. The court introduced Dr. Petty's photos of red marks on Barbara's neck and arm. Barbara explained that recently she had been using a mobile phone regularly to speak with her son in Oklahoma about his

upcoming wedding, but defendant suspected that Barbara was speaking to someone with whom she was having an affair. Barbara denied any prior instances of physical abuse.

Amy Newburn and Alaine Curry worked with Barbara in the physical therapy department at the Rockford Clinic, and Rebecca Burick was one of Barbara's clients. Newburn, Curry, and Burick all saw Barbara on June 5, 2001, but none of the women observed any injuries to Barbara's hands. On June 6, 2001, Barbara did not come to work, and Newburn phoned her at home. When no one answered, Newburn called the police.

On the morning of June 6, 2001, Winnebago County sheriff's deputies Ciaccio and Leombruni went to the Purcell residence and knocked on the door, but no one responded. The officers looked through a window and saw a leg at the bottom of a stairwell. The officers noticed that an exterior door leading to the basement was open and a pane of glass in the door was broken. They entered through the open basement door and saw Barbara lying on the basement stairs, with her bloody head at the bottom of the stairs and her feet pointing toward the top. Barbara had no pulse and showed no signs of life. The court admitted photos of Barbara's body as the officers had found it. The officers searched the house, exterior property, and outbuildings and found no one.

Evidence technicians testified that they took photographs, lifted partial fingerprints from the lower-level entrance to the house, recovered glass fragments and blood samples near Barbara's body, and cast tire tracks found in a field west of the home. The technicians also collected two flashlights, one from the home's living room coffee table and one from the glove compartment of defendant's pickup truck. One of defendant's keys fit the doors to the house.

Debra Foss, the Purcells' cleaning lady, testified that she last cleaned the home on June 1, 2001. Foss entered using the keypad outside the garage door, and the code had not changed since she began working for the Purcells. Police photos taken of the crime scene indicated that a dresser and a jewelry box in the southeast bedroom were open and "dismantled," and Foss testified that they were closed when she left the house on June 1. Also, a photo of the living room coffee table's glass-topped display case showed that it was empty, and Foss testified that the coffee table formerly contained a collection of old coins and currency. A deputy searched defendant's pickup truck the day after Barbara was discovered, and he found a gold hoop earring, other women's jewelry, and a plastic garbage bag containing what appeared to be collectible coins and currency.

While executing a warrant to search defendant's home computer, two other deputies inadvertently found a hidden life insurance policy issued by Barbara's employer, which named defendant as an 80% beneficiary if Barbara died from an accident. As of the time of trial, no claim had been made on the policy.

Eugenia Blosser lived two doors down from the Purcells. Blosser testified that June 5, 2001, was a normal workday for which she awoke at 3:15 a.m. At 4 a.m., Blosser took her dogs outside and saw a man standing behind defendant's parked truck. Blosser was "pretty sure" the man was defendant. Blosser and defendant exchanged "good mornings," and Blosser went back inside. When Blosser left for work 5 to 10 minutes later, defendant and his truck were gone, but lights were on outside the Purcell residence, which was unusual for that time of morning. The next day, Blosser drove past the Purcell home on her way to work and saw the interior lights on, which was also unusual.

Mitch Neiber worked with defendant at a jobsite in Naperville around the time of Barbara's death in Rockford. Neiber did not notice defendant having any problems with his hands, arms, or legs on June 5 or June 6. Another coworker, Dan McFeely, testified that on June 5, 2001, defendant left for the day at 12:30 p.m. after complaining of a headache and feeling unwell. A sandwich shop employee testified that she sold defendant a hot dog and ice cream between 1 and 3 p.m. on June 5, in Rockford.

Deputy Vincent Linberg testified that he spoke to Tom Vaccaro at noon on June 6, 2001, which was a few hours after Barbara's body was discovered. During their conversation, defendant called Vaccaro's mobile phone. On August 22, 2001, Vaccaro testified before the grand jury that indicted defendant for Barbara's murder, and the trial court admitted portions of Vaccaro's testimony. At the time of his testimony, Vaccaro was 73 years old and lived next door to the Purcells. Vaccaro knew that the Purcells had a motion detector that activated exterior lights on their house. Defendant had complained about his marriage "for years" but tried to keep the marriage together. The day after defendant was served with the order of protection, Vaccaro saw defendant's truck parked behind one of the outbuildings on Vaccaro's property. Vaccaro walked onto the Purcells' property and saw the basement door partially open. Vaccaro called for defendant but received no response. Vaccaro walked back toward his own property, and defendant walked up behind him. Vaccaro said, "Damn it, Will, what in the hell are you doing over here? You know you don't belong over here." Defendant replied, "I got what I came for, [a] carton of cigarettes." On either that afternoon or the next day, defendant asked to borrow Vaccaro's car to follow Barbara home from work. Vacarro died in May 2003, during the lengthy pretrial period.

Deputy Tom Murphy testified that he spotted defendant driving at 2:39 p.m. on the day Barbara's body was discovered. Deputy Murphy stopped defendant and asked him to exit the car. While being patted down, defendant asked, "What did my wife do to me this time?" When two other officers arrived, defendant asked, "What did that bitch say now?" The officers told defendant that he was under arrest for violating an order of protection.

At the police station, defendant received his Miranda warnings and agreed to speak with the officers. They asked him to account for his actions following the issuance of the order of protection. Defendant stated that, after he was released on bond on June 1, he and his brother went to defendant's home to retrieve defendant's truck. Defendant admitted that he might have driven past the home once or twice over the next two days to see whether the lawn needed mowing. Defendant stated that, at about 11 a.m. on June 4, he drove to Vaccaro's house, parked in his driveway, walked to the Purcell residence, and retrieved some tools and some of his wife's jewelry. Defendant admitted to borrowing Vaccaro's car to follow Barbara. Defendant returned to his brother's house, where he remained for the rest of the day. Defendant initially stated that, on June 5, he left his brother's home at 3:30 a.m. and drove to a work site in Naperville, where he worked until 3:30 or 4 p.m. Defendant later admitted encountering Blosser outside the Purcell residence at about 4 a.m. that morning. Defendant returned to his brother's house at 5:30 p.m. and did not say what else he did that day.

Defendant did not appear angry or upset when the officers told him that Barbara had been found dead at the bottom of the basement stairs in their home. Defendant did not ask any questions and denied any involvement. Approximately one week later, defendant agreed to another interview, during which he said, "it was an accident."

Forensic pathologist Dr. Larry Blum testified that his autopsy of Barbara disclosed that her death was caused by trauma due to several blunt-force head injuries, including a basal skull fracture. After examining the Purcells' staircase, Blum opined that the injuries could not have been caused by an accidental fall. Blum described the injuries as depicted in several graphic autopsy photographs, which were admitted. The lacerations on the top of Barbara's head were not caused by a fist, but could have been caused by a heavy flashlight. Barbara had no alcohol or illegal drugs in her system, and she did not suffer any significant natural disease at the time of her death. Barbara had contusions on her legs, hip, and arms and a fresh abrasion on her right knee. Blum found fresh lacerations on Barbara's right hand, and her right index finger exhibited a linear blood blister likely caused by a hard pinch. The small bones at the tips of two fingers were crushed. Blum testified that Barbara likely lived in an unconscious state for "perhaps several minutes" after receiving her fatal injuries. The State's dental expert opined that defendant likely bit Barbara's hand, causing swelling and a "C-shaped" abrasion. Defendant's dental expert testified that the abrasion could have been caused by Barbara's hand striking defendant's teeth.

Rockford police sergeant Jeffrey Houde, a bloodstain pattern analyzer, testified that Barbara's head was bent down when she was first struck. According to Sergeant Houde, the blood splatter patterns indicated that Barbara was struck two or three times as she fell down the stairs.

In his own defense, defendant testified that he did not kill Barbara or attack her with a stun gun. Defendant admitted that his 12-year relationship with Barbara began to deteriorate in November 2000. On May 31, 2001, he awoke between 3:30 and 4 a.m. and

began to work on the sunroom in his backyard. At about 6:30 a.m., he went inside for coffee when he saw Barbara. She was startled by his appearance and fell to the floor, dropping her purse. When a cellular phone fell out of her purse, defendant asked why she had it, and Barbara responded that it was none of his business. Barbara would not allow defendant to help her to her feet, and she walked to her car and left for work. Several hours later, defendant left to buy cigarettes, and, when he returned, he encountered two police cars in his driveway. The officers arrested defendant for attacking Barbara with a stun gun, but they could not find the stun gun on the premises. Defendant admitted that he was served with an order of protection at the police station.

Defendant also admitted to a June 4, 2001, conversation with Vaccaro outside the marital residence. Vacarro warned defendant that he "was not supposed to be around" the home. Defendant, believing that Barbara would be at work, retrieved some tools and cigarettes from the sunroom. According to defendant, Vaccaro, not defendant, suggested that defendant borrow Vaccaro's car. Defendant testified that he drove the car for only 25 minutes, and he denied conducting surveillance on Barbara.

Defendant testified that, on June 5, 2001, he left the work site in Naperville at about 1 p.m. and returned to Rockford. At 2 or 3 p.m., defendant wrote a note asking to speak with Barbara, and he placed it under the windshield wiper of Barbara's car, which was parked at her workplace. After purchasing some hanging flower baskets, defendant drove toward Vaccaro's home and saw what appeared to be a police car parked near the Purcell residence. Defendant pulled his truck into a field next to his property, and after the car left, defendant pulled into Vaccaro's driveway. When defendant could not locate Vaccaro, he went to the Purcell residence.

Defendant hung the flower baskets on the deck and looked to see whether Barbara was home. Barbara arrived and told defendant that he was not supposed to be there, but she allowed him inside. Barbara and defendant sat in the living room and discussed the order of protection. Defendant accused Barbara of fabricating the stun gun attack, and she responded, "Well, I got you out of the house." Barbara did not mention a divorce, but she told defendant that she wanted him away from the house for a while.

According to defendant, Barbara "ranted" about his presence, and both were angry and upset. Defendant went to the kitchen for a drink of water, and when he returned, Barbara "popped out, hit [defendant] on the mouth, [and] hit [defendant] with the flashlight." Defendant testified that he and Barbara fought over the flashlight and edged toward the basement stairway. Barbara allegedly struck defendant's mouth repeatedly with the flashlight until defendant grabbed it and struck her "two or three times at the very most." Barbara slipped on a rug or some shoes that were lying at the top of the stairs. Barbara fell head-first and backwards down the stairs. She did not move, but defendant did not see any blood. Defendant asked whether she was alright, and Barbara told him to leave because she intended to call the police.

Defendant testified that he struck Barbara because he felt he was in danger from the flashlight and her kicking. Defendant took an overnight bag that Barbara had prepared for him and went to his brother's home. The bag contained clothing, jewelry, papers, and collectible currency and coins. When he left, defendant believed that Barbara was not seriously injured, and he did not summon medical help because he feared punishment for violating the order of protection.

The parties and the trial court conferred over jury instructions and which exhibits should be sent to the jury. The State did not ask to send Vacarro's grand jury testimony to the jury, but the jury requested it midway through its deliberations. Over defense counsel's objection, the trial court granted the jury's request. The jury found defendant guilty, the trial court sentenced him to natural life imprisonment, and this timely appeal followed.

ANALYSIS

In addition to challenging the length of his sentence, defendant argues that he is entitled to a new trial because the trial court committed reversible error in admitting (1) Barbara's out-of-court statements to Dr. Petty and Deputy Perry regarding the stun gun attack and (2) portions of Vaccaro's grand jury testimony in which he stated that defendant borrowed his car to follow Barbara.

A. Evidentiary Issues

We initially note that, while the State moved in limine to admit Barbara's out-of-court statements as excited utterances, it is unclear whether the trial court actually admitted them on that ground. It is also unclear on what ground the court admitted Vaccaro's grand jury testimony. Nevertheless, defendant's sole argument for the exclusion of Barbara's out-of-court statements and Vaccaro's grand jury testimony focuses on Crawford and his rights under the confrontation clause. Therefore, we assume, as defendant essentially concedes, that Crawford is the only authority under which the challenged statements might be inadmissible.

Next, we address our standard of review. Defendant contends that we must review the trial court's evidentiary rulings de novo because they "depend[] upon a question of law." We disagree. Generally, evidentiary rulings are within the sound discretion of the trial

court and will not be reversed unless the trial court has abused that discretion. See, e.g., People v. Caffey, 205 Ill. 2d 52, 89 (2001). A trial court abuses its discretion only where the ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. Caffey, 205 Ill. 2d at 89.

As in this case, the defendant in Caffey argued that the evidentiary rulings at issue were uniquely legal rulings, which must be reviewed de novo. Caffey, 205 Ill. 2d at 89. Acknowledging that evidentiary rulings are occasionally reviewed de novo, our supreme court stated that this exception to the general rule of deference applies in cases where " 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " Caffey, 205 Ill. 2d at 89, quoting People v. Williams, 188 Ill. 2d 365, 369 (1999).

In Caffey, the supreme court reviewed the evidentiary rulings with deference to the trial court, noting that a decision to admit evidence cannot be made in isolation and requires consideration of a number of circumstances that bear on the issue, including questions of reliability and prejudice. Caffey, 205 Ill. 2d at 89. Adhering to Caffey, we review the legal issues implicated by the trial court's evidentiary rulings, but we defer to the rulings unless the " 'trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " Caffey, 205 Ill. 2d at 89, quoting Williams, 188 Ill. 2d at 369.

The sixth amendment's confrontation clause, which applies to both federal and state prosecutions (Crawford, 541 U.S. at 42, 158 L. Ed. 2d at 187, 124 S. Ct. at 1359), provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. The confrontation clause generally bars hearsay evidence, which is " 'an out-of-court statement offered to prove the truth of the

matter asserted.' " <u>Caffey</u>, 205 Ill. 2d at 88, quoting <u>People v. Olinger</u>, 176 Ill. 2d 326, 357 (1997).

Before <u>Crawford</u>, hearsay was admissible against a criminal defendant if the declarant was unavailable and the statement bore sufficient indicia of reliability. <u>Ohio v. Roberts</u>, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). However, in <u>Crawford</u>, the Supreme Court reinterpreted the confrontation clause and held that the "testimonial" hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. <u>Crawford</u>, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. In abrogating <u>Roberts</u>, the Court held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." <u>Crawford</u>, 541 U.S. at 68-69, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. "When an out-of-court statement is *** nontestimonial, the 'indicia of reliability' framework of <u>Ohio v. Roberts</u>, and the hearsay exception[s] *** continue to apply." <u>People v. R.F.</u>, 355 Ill. App. 3d 992, 1000 (2005).

We initially consider the retroactivity of <u>Crawford</u> to this case. Defendant filed his timely notice of appeal on November 17, 2003, and the Supreme Court decided <u>Crawford</u> on March 8, 2004, while this appeal was pending. Judicial opinions announcing new constitutional rules that apply to criminal cases are retroactive to all cases, such as this one, pending on direct review at the time the new constitutional rule is declared. See <u>People v. Ford</u>, 198 Ill. 2d 68, 72-73 (2001); <u>People v. Thompson</u>, 349 Ill. App. 3d 587, 594 (2004) (applying <u>Crawford</u> retroactively). Therefore, <u>Crawford</u> applies retroactively to this case.

Here, the trial court instructed the jury to consider admitted evidence as follows:

"From time to time it has been the duty of the court to rule on the admissibility of evidence. You should not concern yourselves with the reasons for these rulings. You should disregard questions and exhibits which were withdrawn or to which objections were sustained.

Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

You should disregard testimony and exhibits which the court has refused or stricken.

The evidence which you should consider consists only of the testimony of the witnesses and the exhibits which the court has received."

It appears that the trial court did not instruct the jury to consider any of the challenged statements for a limited purpose. Therefore, we presume that the jury considered the statements as hearsay evidence of the truth of the matter asserted. The parties obviously agree that Barbara and Vaccaro were deceased and unavailable to testify at trial. The parties further agree that Barbara's reports of the stun gun attack and Vaccaro's grand jury testimony were not subject to cross-examination. Therefore, our Crawford analysis focuses on whether the statements were "testimonial."

The Crawford Court declined to define "testimonial" precisely. However, the Court provided three formulations of the core class of testimonial statements, which the Court of Appeals for the First Circuit described as follows:

"In the first, testimonial statements consist of 'ex parte in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations,

prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' [Citation.] The second formulation described testimonial statements as consisting of 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' [Citation.] Finally, the third explained that testimonial statements are those 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' [Citation.] While the Court declined to settle on a single formulation, it noted that, '[w]hatever else the term [testimonial] covers, it applies ... to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. These are the modern abuses at which the Confrontation Clause was directed.' " (Emphasis added.) Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004), quoting Crawford, 541 U.S. at 51-52, 52, 68, 158 L. Ed. 2d at 193, 193, 203, 124 S. Ct. at 1364, 1364, 1374.

See also People v. Patterson, 217 Ill. 2d 407, 422-23 (2005).

### 1. Barbara's Out-Of-Court Statements

Defendant allegedly attacked Barbara with a stun gun at 6:40 a.m. on May 31, 2001, but Barbara did not report the incident immediately. Barbara went to work and waited nearly six hours before reporting defendant's attack to Deputy Perry at the police station. Approximately two hours after speaking with Deputy Perry, Barbara reported the incident to Dr. Petty while being treated during a hospital visit.

Within a few hours of Barbara's report to Deputy Perry, defendant was charged with domestic battery and unlawful use of weapons, and Barbara successfully petitioned for an

order of protection barring defendant from having any contact with her. Barbara's statements to Deputy Perry fall under Crawford's third formulation of testimonial hearsay. The statements were made under circumstances that would lead an objective witness reasonably to believe that the statements would be available for use at a later trial. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374 (statements are testimonial if elicited during "police interrogations").

Furthermore, according to Crawford, the term "interrogation" is viewed in a colloquial rather than a technical legal sense. Crawford, 541 U.S. at 53 n.4, 158 L. Ed. 2d at 194 n.4, 124 S. Ct. at 1365 n.4. Thus, a statement made to a police officer is testimonial if the officer is acting in an investigative capacity for the purpose of producing evidence in anticipation of a criminal prosecution. See People v. West, 355 Ill. App. 3d 28 (2005). Barbara's statements to Deputy Perry were testimonial because they were " 'made in response to police questioning while the police were conducting an investigation into the *** commission of a crime.' " People v. Gilmore, 356 Ill. App. 3d 1023, 1032 (2005), quoting People v. Victors, 353 Ill. App. 3d 801, 812 (2004) (domestic battery victim's statements to police officer were testimonial because the statements were made while officer was investigating the incident).

We similarly conclude that Barbara's statements to Dr. Petty during the hospital visit were testimonial under Crawford. The Appellate Court, First District, has generally held that "Crawford does not apply to statements made to nongovernmental personnel, such as family members or physicians. When an out-of-court statement is made to nongovernmental personnel, and, thus, is nontestimonial, the 'indicia of reliability' framework of Ohio v. Roberts, and the hearsay exception[s] *** continue to apply." R.F.,

355 Ill. App. 3d at 1000. However, in In re T.T., 351 Ill. App. 3d 976 (2004), the First District specifically addressed a situation in which a statement made to nongovernmental personnel was testimonial and thus violated the confrontation clause. In In re T.T., the court deemed admissible some of the victim's "nontestimonial" statements made to the examining physician but excluded other "testimonial statements" for violating the confrontation clause. The court reasoned that the victim's statements regarding the nature of the alleged attack, the physical exam, and complaints of pain or injury "were not accusatory against respondent at the time made and, thus, do not trigger enhanced protection under the confrontation clause." In re T.T., 351 Ill. App. 3d at 993. However, the court excluded the victim's "accusatory statements [to the examining physician] identifying respondent as the perpetrator [because those statements] implicate[d] the core concerns protected by the confrontation clause." In re T.T., 351 Ill. App. 3d at 993. The court held that, when the content of the victim's statement concerns fault or identity, such a testimonial statement is admissible only if the declarant testifies at trial and is subject to cross-examination. In re T.T., 351 Ill. App. 3d at 993.

In In re T.T., the court distinguished between the physician, who was referred to the victim by the Department of Children and Family Services (DCFS) (a governmental agency), and actual governmental officers such as the police or DCFS investigators. In re T.T., 351 Ill. App. 3d at 993-94. The court noted that "[i]n contrast to government officers like the police or DCFS investigators, medical personnel who treat and diagnose sexual assault victims do not take on a similar investigatory or prosecutorial function." In re T.T., 351 Ill. App. 3d at 993. In determining whether the testimony violated the accused's right to confrontation, the court focused on the nature of the testimony rather than the official or

unofficial status of the person whom the State called to testify to the declarant's out-of-court statement.

In this case, Dr. Petty treated Barbara for the injuries she sustained earlier that day on May 31, 2001.  At the time of the hospital visit, Dr. Petty's role was medical rather than investigatory.  Barbara's statements describing her injuries were nontestimonial because they "were not accusatory against [defendant] at the time made and, thus, do not trigger enhanced protection under the confrontation clause."  In re T.T., 351 Ill. App. 3d at 993.  However, Barbara's remaining statements to Dr. Petty were testimonial because they described the physical confrontation and identified defendant as the attacker.  Thus, we conclude that Crawford gave defendant the right to bar Dr. Petty from testifying to the portion of Barbara's statements in which she described defendant's attack with the stun gun.

Upon concluding that Barbara's two reports of the stun gun attack were testimonial, we next consider whether the Crawford violation mandates their exclusion and a new trial.

We conclude that the error was harmless beyond a reasonable doubt.  In Patterson, our supreme court ruled that the admission of grand jury testimony in violation of Crawford does not mandate a new trial if the error is harmless.  See Patterson, 217 Ill. 2d at 424.  In reaching this conclusion, the Patterson court noted that "[c]onfrontation clause violations such as [the erroneous admission of grand jury testimony of an unavailable witness] are not 'structural defects in the constitution of the trial mechanism' that affect '[t]he entire conduct of the trial from beginning to end.' "  Patterson, 217 Ill. 2d at 424, quoting Arizona v. Fulminante, 499 U.S. 279, 309, 113 L. Ed. 2d 302, 331, 111 S. Ct. 1246, 1265 (1991).  The admission of Barbara's out-of-court statements is similar to the erroneous admission of the grand jury testimony in Patterson, because their admission was not a structural defect that

affected the entire trial. Therefore, we interpret Patterson broadly, concluding that a harmless-constitutional-error analysis applies equally to the Crawford violation involving Barbara's out-of-court statements here. In light of the overwhelming evidence of defendant's guilt, we conclude that the erroneous admission of the testimony of Dr. Petty and Deputy Perry was harmless because it did not contribute to the guilty verdict.

The Patterson court summarized the harmless-constitutional-error test as follows: "In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. Sullivan v. Louisiana, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189, 113 S. Ct. 2078, 2081 (1993); Satterwhite v. Texas, 486 U.S. 249, 258-59, 100 L. Ed. 2d 284, 295, 108 S. Ct. 1792, 1798 (1988); Chapman v. California, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 828 (1967). The State bears the burden of proof. Sullivan, 508 U.S. at 278-79, 124 L. Ed. 2d at 189, 113 S. Ct. at 2081; Brecht v. Abrahamson, 507 U.S. 619, 630, 123 L. Ed. 2d 353, 368, 113 S. Ct. 1710, 1717 (1993); Satterwhite, 486 U.S. at 258, 100 L. Ed. 2d at 295, 108 S. Ct. at 1798. In People v. Wilkerson, 87 Ill. 2d 151 (1981), this court listed three different approaches for measuring error under this harmless-constitutional-error test: (1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. Wilkerson, 87 Ill. 2d at 157. See also People v. Collins, 85 Ill. App. 3d 1056, 1060 (1980)." Patterson, 217 Ill. 2d at 428.

The combination of defendant's own trial testimony and the photographic and forensic evidence established defendant's guilt overwhelmingly. Defendant admitted that, while struggling with Barbara, he seized the flashlight from her and struck her "two or three times." Defendant stated that he did not recall where he struck Barbara, but photographs of the scene depict severe injuries to Barbara's face. Furthermore, Dr. Blum opined that Barbara died from trauma caused by several blunt-force head injuries, including a basal skull fracture. After examining the Purcells' staircase, Dr. Blum opined that the injuries could not have been caused by an accidental fall as defendant had suggested.

We acknowledge that the jury would not have learned the details of the alleged stun gun attack if the trial court had not erroneously admitted the testimony of Dr. Petty and Deputy Perry. Furthermore, the violent nature of the attack and its temporal and spatial proximity to Barbara's death made the evidence especially persuasive. However, even if the jury had not heard the details regarding the stun gun attack, other unchallenged evidence would have generally informed the jury that an order of protection against defendant was in effect at the time of Barbara's death. For instance, defendant testified that he left a note on Barbara's car a few hours before their altercation. Defendant admitted that he left the note in an attempt to speak with Barbara about the order of protection. Defendant also testified that Barbara fabricated the allegations that led to the order of protection. Moreover, Deputy Murphy testified that he told defendant that he was being arrested for violating the order of protection. This unchallenged evidence would have disclosed the existence of the order of protection without divulging the details of the stun gun attack, which could be introduced only through the testimony of Dr. Petty and Deputy Perry.

An order of protection may be issued "[i]f the court finds that petitioner has been abused by a family or household member." (Emphasis added.) 750 ILCS 60/214(a) (West 2004). Under the Domestic Violence Act of 1986 (750 ILCS 60/101 et seq. (West 2004)), " '[a]buse' means physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (West 2004). Furthermore, "physical abuse" includes knowing or reckless use of physical force, confinement, restraint, or conduct that creates an immediate risk of physical harm. 750 ILCS 60/103(14)(I), (14)(iii) (West 2004). When the jurors learned, without objection from the defense, that Barbara held an order of protection against defendant, they were free to draw the reasonable inference that defendant had been accused of abusing Barbara. Even if the testimony of Dr. Petty and Deputy Perry had been excluded, the jury would have heard the general allegation of prior abuse as evidence of defendant's intent and absence of mistake in Barbara's homicide. Defendant's and Deputy Murphy's testimony regarding the existence of the order of protection rendered harmless any discussion of the details underlying the order of protection.

Moreover, defendant's testimony regarding his struggle with Barbara over the flashlight duplicated the details of the stun gun attack in establishing that the couple's relationship had turned violent. Although the better course would have been to exclude the details of the stun gun attack, we view it as cumulative evidence of the escalating marital acrimony. Moreover, the circumstantial evidence of the stun gun attack was harmless in light of defendant's own testimony regarding his involvement in Barbara's death, because the couple's argument and struggle over the flashlight actually caused the homicide. The admission of the challenged evidence might have constituted reversible error if defendant

had chosen not to offer his own inculpatory testimony, but we need not consider that possibility, because defendant's admissions at trial established beyond a reasonable doubt that he knowingly created a strong probability of death or great bodily harm by inflicting Barbara's fatal injuries.

The State further argues that, even if Barbara's statements were testimonial under Crawford, the trial court did not abuse its discretion in admitting them, because defendant forfeited his sixth amendment right to confront Barbara by having caused her unavailability at trial. The State urges us to adopt and apply the forfeiture-by-wrongdoing doctrine as set forth in People v. Melchor, 362 Ill. App. 3d 335 (2005).

The forfeiture-by-wrongdoing doctrine was first enunciated by the Supreme Court in Reynolds v. United States, 98 U.S. 145, 25 L. Ed. 244 (1878). The Court held:

"The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." Reynolds, 98 U.S. at 158, 25 L. Ed. at 247.

The Crawford Court specifically noted that it continued to adhere on equitable grounds to the rule that "forfeiture by wrongdoing" can extinguish a criminal defendant's

confrontation rights.  Crawford, 541 U.S. at 62, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370.

The application of the forfeiture-by-wrongdoing doctrine to a Crawford violation presents an

interesting constitutional question.   However, our harmless-error analysis disposes of

defendant's challenge to the admission of Barbara's out-of-court statements and obviates

our need to take a position on the forfeiture-by-wrongdoing doctrine at this time.[1]

## 2.  Vaccaro's Grand Jury Testimony

In this case, Vaccaro's statements were part of his grand jury testimony, and the trial

court admitted them pursuant to section 115--10.4 of the Code, entitled, "Admissibility of

prior statement when witness is deceased."  Section 115--10.4 provides as follows:

---

[1] The Melchor court observed that "a case is currently pending before the Illinois Supreme Court that is expected to address the forfeiture by wrongdoing doctrine in relation to Crawford. People v. Stechly, No. 97544 (2005)."  Melchor, 362 Ill. App. 3d at 343 n.5.  Stechly has not yet been decided, and we find it unnecessary to publish dicta on an issue that soon will be decided by our supreme court.  The respective procedural postures of this case and Stechly support our decision not to adopt or reject the forfeiture-by-wrongdoing doctrine.

"(a) A statement not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule if the declarant is deceased and if the court determines that:

(1) the statement is offered as evidence of a material fact; and

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of this Section and the interests of justice will best be served by admission of the statement into evidence.

\*\*\*

(c) Unavailability as a witness under this Section is limited to the situation in which the declarant is deceased.

(d) Any prior statement that is sought to be admitted under this Section must have been made by the declarant under oath at a trial, hearing, or other proceeding."  725 ILCS 5/115--10.4 (West 2004).

Vaccaro's grand jury testimony is one of the limited types of "testimonial" hearsay specifically mentioned in Crawford, and therefore, the testimony should have been excluded.  See Patterson, 217 Ill. 2d at 423.  Nevertheless, the parties dispute whether the admission of Vaccaro's statements was reversible error.

In Patterson, our supreme court addressed a similar Crawford violation in which the grand jury testimony of an unavailable witness was admitted in a criminal trial.  Patterson, 217 Ill. 2d at 423.  As noted, the court held that the admission of grand jury testimony in violation of Crawford does not mandate a new trial if the error is harmless.  See Patterson,

217 Ill. 2d at 423. We conclude that, in light of the overwhelming evidence of defendant's guilt, the erroneous admission of Vaccaro's grand jury testimony was also harmless.

Defendant contends that "the fact that, after listening to the testimony of about 50 witnesses, the jury requested no transcript other than the Vaccaro testimony is a strong indication that Vaccaro was viewed as a critical information source" that influenced the verdict. Our supreme court rejected the same argument in Patterson. The Patterson court held that "the mere fact that the jury asked for a copy of the testimony does not create a reasonable probability, or even a reasonable possibility, that the jury relied on this testimony in reaching its verdict. To contend that it does is, in our view, speculative." Patterson, 217 Ill. 2d at 435. In agreement with Patterson, we decline to engage in such speculation and, instead, "we base our harmless-error decision on the analysis outlined in Wilkerson for assessing error under the harmless-constitutional-error test." Patterson, 217 Ill. 2d at 435.

Aspects of Vaccaro's grand jury testimony duplicated other admitted evidence. Through the reading of Vaccaro's grand jury testimony, the jury heard that (1) defendant's marriage was deteriorating before Barbara's death, (2) Vaccaro discovered defendant on the Purcell property in violation of the order of protection, and (3) defendant asked to borrow Vaccaro's car to follow Barbara home from work, also in violation of the order of protection. However, defendant himself testified to his marital problems and to his encounter with Vaccaro outside the Purcell residence. Therefore, Vaccaro's grand jury testimony was merely cumulative on these points. Defendant admitted that he borrowed Vaccaro's car but denied using it to follow Barbara. However, Deputy Larry Marino testified that, on the day Barbara's body was discovered, defendant admitted that he borrowed Vaccaro's car to follow

Barbara. In light of defendant's admission to his physical conflict with Barbara near the stairs, Vaccaro's statement regarding improper surveillance seems trivial.

As we discussed in our analysis of the harmless admission of Barbara's out-of-court statements, we conclude that the combination of defendant's own testimony and the photographic and forensic evidence established defendant's guilt overwhelmingly. This quantum of evidence illustrates that the admission of Vaccaro's grand jury testimony regarding defendant's prior violations of the order of protection was harmless beyond a reasonable doubt.

### B. Sentence Excessiveness

Defendant next contends that the trial court abused its discretion in sentencing him to natural life imprisonment. It is well settled that a trial court has broad discretion in imposing a sentence within the statutory limits. People v. Fern, 189 Ill. 2d 48, 53 (1999). A trial court's sentencing decision is entitled to great deference (People v. Perruquet, 68 Ill. 2d 149, 154 (1977)) because the trial court is generally in a better position than a reviewing court to weigh such factors as the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. People v. Streit, 142 Ill. 2d 13, 19 (1991). Consequently, a reviewing court may not substitute its judgment for that of the trial court merely because it might have weighed the sentencing factors differently (People v. Stacey, 193 Ill. 2d 203, 209 (2000)), and a reviewing court will not reduce a sentence within the statutory range unless the trial court has abused its discretion in imposing the sentence (People v. Jones, 168 Ill. 2d 367, 373-74 (1995)). Nevertheless, our sentencing scheme is individualized and the trial court must base its decision on the particular circumstances of the case. Fern, 189 Ill. 2d at 55. A reviewing court must grant relief if the term imposed "is

greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." Stacey, 193 Ill. 2d at 210.

Defendant was convicted of first-degree murder for knowingly creating a strong probability of death or great bodily harm to Barbara by striking her in the head with a blunt object and causing her death knowing that she was the subject of an order of protection that barred him from having contact with her. See 720 ILCS 5/9--1(a)(2), 9--1(b)(19) (West 2004). Ordinarily, first-degree murder is punishable by a nonextended term of 20 to 60 years' imprisonment. 730 ILCS 5/5--8--1(a)(1) (2004). However, defendant qualified for an extended term of natural life imprisonment for committing the first-degree murder of a person who held an order of protection against him. See 720 ILCS 5/9--1(b)(19) (West 2004); 730 ILCS 5/5--8--1(a)(1)(b) (West 2004).

Defendant concedes that his sentence was within the statutory range of punishment, but he asks us to reduce his sentence from natural life to the 20-year statutory minimum. In support, defendant cites the evidence of his excellent employment record, his limited criminal record, and the purported spontaneity of the offense. We decline to substitute our judgment for that of the trial court.

Defendant contends that "hitting someone in the head with a blunt object is not a reliable way to go about committing a murder," and therefore, he was less culpable for acting "on the spur of the moment." The photographic evidence alone undermines defendant's position that his flashlight was somehow an "unreliable" weapon. The record contains many graphic images of Barbara's bludgeoned face and the bloody crime scene. Regardless of the alleged spontaneity of defendant's actions, the exhibits show that defendant beat Barbara severely and left her to die.

Defendant cites <u>People v. Lee</u>, 342 Ill. App. 3d 37 (2003), for the proposition that we must reduce his sentence. In <u>Lee</u>, the appellate court affirmed a 70-year sentence for a murder found to be exceptionally brutal or heinous because the defendant and his wife met the victim in a bar and brought her home where she was beaten, repeatedly stabbed, and smothered. <u>Lee</u>, 342 Ill. App. 3d at 56-57. Defendant argues that he deserves a less severe sentence than the defendant in <u>Lee</u> because "the attack on Barbara Purcell appears to have been only violent enough to have caused her death."

We reject the assertion that <u>Lee</u> mandates a reduction of the sentence in this case. In <u>Lee</u>, the appellate court deferred to the trial court's imposition of a statutorily authorized extended-term sentence under the particular circumstances of that case. We elect to follow the same course here. After reviewing the mitigating and aggravating evidence, including testimony that defendant beat his first wife, we conclude that the trial court did not abuse its discretion in choosing a sentence. The life term "is [not] greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." <u>Stacey</u>, 193 Ill. 2d at 210.

For the preceding reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

O'MALLEY and GILLERAN JOHNSON, JJ., concur.