Docket No. 101772.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. EFREN MELCHOR, Appellee.

*Opinion filed June 7, 2007.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Burke took no part in the decision.

## OPINION

Following a jury trial in the circuit court of Cook County, defendant, Efren Melchor, was convicted of first degree murder. See Ill. Rev. Stat. 1989, ch. 38, par. 9–1(a). At the close of a sentencing hearing, the trial court sentenced defendant to a prison term of 40 years. Finding that the admission of certain evidence violated defendant's constitutional rights, the appellate court reversed defendant's conviction and remanded for a new trial. 362 Ill. App. 3d 335. We allowed the State's petition for leave to appeal (210 Ill. 2d R. 315(a)). As explained herein, we now vacate the judgment of the appellate court and remand to the appellate court for that court's initial consideration of nonconstitutional issues.

# I. BACKGROUND

On April 30, 1990, the victim, Steven Botello, was shot to death at 2624 West Fullerton Avenue in Chicago. On May 6, 1990, defendant and Ancermo Paredes were arrested for the murder, and both were charged by information with first degree murder. On May 15, 1990, defendant was released after posting bond. However, defendant failed to appear on several subsequent court dates. In October 1990, defendant's bond was forfeited and a warrant for his arrest was issued. Defendant remained a fugitive for the next 10 years.

Meanwhile, in May 1991, Paredes received a bench trial for the victim's murder. Among the witnesses who testified were Paredes, who testified on his own behalf, and Luis Ortiz, then 16 years old, who was the sole eyewitness to the shooting. Ortiz's testimony implicated both Paredes and defendant. The trial court found Paredes not guilty. On September 11, 1998, Ortiz died as a result of a self-inflicted drug overdose. Also, sometime subsequent to his trial, Paredes was deported to Mexico.

On October 15, 2000, defendant was arrested on the outstanding arrest warrant. Prior to defendant's trial, the State indicated its intent to use the testimony of Paredes and Ortiz from Paredes' trial because both were unavailable. Defendant moved to preclude the State from using their out-of-court statements, arguing that their use would violate his confrontation rights, and that the prior testimony, particularly that of Ortiz, did not bear sufficient guarantees of trustworthiness. After a hearing, at which the State confirmed that Ortiz was the sole eyewitness to the shooting, the trial court denied defendant's motion and found that the prior testimony was admissible pursuant to section 115–10.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10.4 (West 2004)). However, the court denied the State's request to use Paredes' prior testimony.

At defendant's trial, the State's case was as follows. Julio Diaz, who was 30 years old at the time of defendant's trial, testified that on April 29, 1990, from approximately 9 p.m. to midnight, he was playing basketball in Haas Park at Fullerton and Washtenaw Avenues with Ortiz, the victim, and "Tootie." At approximately 11:30 p.m., the group left the park. At this time, they saw four Hispanic males coming in their direction on the same side of the street, none of whom Diaz recognized. Tootie said he was going to "mess with" them. A brawl

ensued. Jamie Figueroa (also deceased at the time of defendant's trial) joined the fight. After approximately 10 minutes, the fight broke up because the victim yelled that he saw the police.

Diaz, Ortiz, the victim, and Figueroa hid under a viaduct for a few minutes after the fight broke up. The four then walked to the intersection of Fullerton and California Avenues, where the victim left the group to visit his daughter, who lived near the intersection. Approximately 10 minutes later, the victim returned. As the victim was walking toward them, Diaz saw a two-door gray Toyota hatchback attempt to hit the victim. Diaz also saw four individuals in the car and recognized as least one of them as one of the men his group had been fighting with earlier. Diaz identified this man as Paredes.

The group then started walking eastbound on Fullerton toward a tavern. Diaz left the group to go to a nearby school playground. While there, Diaz heard two sounds like firecrackers. Diaz rode a bicycle toward Fullerton. He saw a squad car and the victim on the ground. He believed that the squad car had struck the victim. Diaz then rode to a nearby gas station, and then returned to the scene of what he believed to be an accident. The victim was still lying on the street and, at this time, Diaz found out that the victim had been shot. On cross-examination, Diaz admitted that he never observed the person who actually shot the victim.

Christopher Donnelly, the assistant State's Attorney who prosecuted Paredes in 1991, read Ortiz's testimony from Paredes' trial. Ortiz's testimony regarding the fight and attempted hit-and-run was basically consistent with Diaz's testimony. Ortiz stated that there were four individuals in the car and that he saw the faces of two individuals in the backseat. Ortiz recognized Paredes, sitting in the rear passenger seat, as one of the individuals he had seen earlier that night in the fight. Ortiz further testified that he saw the shooter, whom he later identified as defendant, sitting in the front passenger seat.

Ortiz further testified that he, Diaz, the victim, and Figueroa then walked eastbound on Fullerton. When they were in front of the tavern, Ortiz stopped and spoke to friends. Diaz left on a bicycle to go to Gaither Park. The victim borrowed a bicycle and departed because he had left his wallet at the park. Ortiz observed the victim looking for his wallet, when a small gray car pulled into the parking lot by the

park. Ortiz recognized the car as the one that tried to run over the victim. According to Ortiz, the passenger side door opened, a man got out, reached over the roof of the car, and shot the victim. The shooter then got back in the car and it drove off.

Further, Ortiz testified that on May 6, 1990, he went to Chicago police Area 5 headquarters and viewed a lineup. He identified Paredes as one of the individuals with whom he had been fighting and defendant as the shooter, but not someone who had been involved in the fight. On cross-examination by Paredes' defense counsel, Ortiz gave varying distances between himself and the car at the time of the shooting, ranging between 5 and 100 feet.

Chicago police detective Reynaldo Guevara testified that, shortly after the shooting, he arrested defendant and Paredes. Detective Roland Paulnitsky testified that on May 6, 1990, he conducted a four-person lineup including defendant and Paredes. According to Detective Paulnitsky, Ortiz viewed the lineup and identified defendant as the shooter and Paredes as a passenger in the vehicle.

The defense case included the following testimony. Nicholas Roman testified that he was working with defendant at the time of the murder. In April 1990, Roman was employed as the second-shift dishwasher and cleanup supervisor at a Streeterville-area restaurant. Roman told police that on April 29, 1990, defendant began work between 1 and 1:30 p.m. and worked until approximately 1 a.m. Roman was shown defendant's timecard, which indicated that defendant punched in at 4 or 4:30 p.m. and punched out at 10:06 p.m. Roman explained that defendant punched out only for a 30-minute break and was unable to punch back in because the time clock was broken. Roman and defendant worked together for approximately two years and were solely work acquaintances. Roman had not seen defendant subsequent to his arrest in 1990.

Defendant testified that in April 1990 he worked as a dishwasher at a Streeterville-area restaurant, with his supervisor Nicholas Roman. On April 29, 1990, defendant worked from 1 p.m. until approximately 1 a.m. Defendant knew Paredes because they lived in the same building, but they socialized only occasionally. Defendant denied owning a gun or a gray Toyota, and denied being a passenger in a gray Toyota on April 29 or 30, 1990. Defendant denied shooting anyone during that time and denied being in a gang.

Defendant admitted that he was arrested on May 5, 1990. When defendant made bail, he knew that he had to return to court and he knew his next court date. Defendant failed to appear because his brother had been threatened by gang members, and believed that defendant would have been killed if he appeared in court. From 1990 to 2000, defendant moved often and was paid in cash for his work.

Following closing arguments, the jury found defendant guilty of first degree murder. Defendant timely filed a motion for a new trial, in which he contended, *inter alia*, that the trial court erred in: (1) admitting Ortiz's testimony, (2) refusing to allow defendant to impeach Ortiz's testimony with a robbery charge that was pending at the time of Paredes' trial, and (3) refusing to allow defendant to impeach Ortiz's testimony with a 1994 conviction for armed robbery. At the close of a hearing, the trial court denied defendant's motion for a new trial. The court reasoned that if Ortiz's testimony had been the only evidence of defendant's guilt, the court would have directed a verdict in defendant's favor. However, according to the trial court, defendant provided additional evidence of his guilt: his flight and an unsuccessful alibi defense. At the close of a sentencing hearing, the trial court sentenced defendant to a prison term of 40 years. Defendant timely appealed.

The appellate court reversed, holding that the admission of Ortiz's testimony violated defendant's sixth amendment right of confrontation, pursuant to *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). 362 Ill. App. 3d at 341-43. Further, the appellate court held that defendant did not forfeit his confrontation challenge by his wrongdoing, *i.e.*, bail-jumping (362 Ill. App. 3d at 343-55), and that the erroneous admission of Ortiz's testimony was not constitutionally harmless (362 Ill. App. 3d at 355-56). The appellate court next reasoned that its resolution of this constitutional issue "rendered moot" defendant's contention that Ortiz's testimony was inadmissible under the applicable statutory hearsay exception. *Melchor*, No. 1–03–3036 (nonpublishable portion of opinion under Supreme Court Rule 23). The appellate court proceeded to address other issues raised by defendant that were likely to reoccur upon retrial. *Melchor*, No. 1–03–3036 (nonpublishable portion of opinion under Supreme Court Rule 23). After finding no double jeopardy impediment, the appellate court reversed defendant's

conviction and remanded the cause to the circuit court for a new trial. 362 Ill. App. 3d at 356-57.

The State appeals. We will refer to additional pertinent background in the context of our analysis of the issues.

## II. ANALYSIS

At the outset, we note our concern with the appellate court's procedure in filing the opinion under review. The appellate court filed an opinion in this case on June 28, 2005, and rehearing was denied on November 9, 2005. However, on November 14, 2005, the court filed its ultimate opinion *nunc pro tunc* June 28, 2005.

We have two concerns with this procedure. First, such a practice may have jurisdictional consequences. Had the State filed a petition for leave to appeal in this court between November 9 and 14, 2005, the second opinion would have been void for lack of jurisdiction. *People v. Collins*, 202 Ill. 2d 59, 65 (2002). Second, the use of *nunc pro tunc* orders or judgments is limited to incorporating into the record something which was actually previously done by the court but inadvertently omitted by clerical error. It may not be used for supplying omitted judicial action, or correcting judicial errors under the pretense of correcting clerical errors. See *People v. I.W.I., Inc.*, 176 Ill. App. 3d 951, 958-59 (1988) (and cases cited therein); *Dauderman v. Dauderman*, 130 Ill. App. 2d 807, 809-10 (1970). We thus take this opportunity to remind the bench and bar of these important points of appellate practice and procedure.

Turning to the merits, before the appellate court defendant raised eight issues pertaining to trial and sentencing and sought relief based on each issue. Defendant first contended that the admission of Ortiz's testimony violated his sixth amendment right of confrontation, pursuant to *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). Defendant next contended that, assuming no *Crawford* violation, "Ortiz's prior testimony lacked sufficient guarantees of trustworthiness" as required by the statutory hearsay exception for an out-of-court statement of a dead declarant. See 725 ILCS 5/115–10.4 (West 2002) ("Admissibility of prior statements when witness is deceased").

The appellate court began its analysis by addressing several issues pertaining to defendant's *Crawford* contention. This is understandable since defendant began his argument by raising those issues. Based on its analysis of the constitutional issues, the appellate court reversed defendant's convictions and remanded for a new trial. 362 Ill. App. 3d at 341-56. Next, the appellate court addressed defendant's contention of the statutory hearsay violation as follows:

> "Based on this conclusion [finding a *Crawford* violation], we need not address defendant's argument that the admission of Ortiz's testimony was erroneous because it lacked sufficient guarantees of trustworthiness since this issue has been rendered moot." *Melchor*, No. 1–03–3036 (nonpublishable portion of opinion under Supreme Court Rule 23).

The structure of defendant's argument and the corresponding analysis of the appellate court run afoul of this court's recent decision in *In re E.H.*, of which defendant and the appellate court admittedly did not have the benefit.

*E.H.* resembles the present case. The appellate court in *E.H.* had declared the statutory hearsay exception for a nontestifying child sexual abuse victim (725 ILCS 5/115–10 (West 2004)) facially unconstitutional as violative of *Crawford*. This court vacated the appellate court's judgment. We reaffirmed the long-recognized policy that "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort." *In re E.H.*, 224 Ill. 2d 172, 178 (2006) (collecting cases).

Further, "agree[ing] entirely" (*E.H.*, 224 Ill. 2d at 179) with the observation of the appellate court in *People v. Martinez*, 348 Ill. App. 3d 521, 535 (2004), we explained: "When a court is asked to evaluate the admission of out-of-court statements into evidence, the *first* step is determining whether the statement passes muster as an evidentiary matter." (Emphasis in original.) *E.H.*, 224 Ill. 2d at 179. If the proponent seeks to admit the statement pursuant to a statutory hearsay exception, the court must evaluate the statement to determine whether it meets the statute's requirements. We reasoned:

> "Only once the statement has first been found admissible as an evidentiary matter should constitutional objections–including *Crawford*-based confrontation clause claims–be dealt with.

-7-

[Citations.] This is the only analytical 'flow chart' that comports with the rule that courts must avoid considering constitutional questions where the case can be decided on nonconstitutional grounds." *E.H.*, 224 Ill. 2d at 179-80.

We remanded the cause to the appellate court to first consider the nonconstitutional issues raised, reaching the constitutional issues only if necessary. *E.H.*, 224 Ill. 2d at 181-82.

Likewise in this case, the first contention that the appellate court should have addressed is whether the trial court erred in ruling that Ortiz's testimony was admissible pursuant to section 115–10.4 of the Code of Criminal Procedure (725 ILCS 5/115–10.4 (West 2004)). This statute, enacted in 1999, provides a hearsay exception for an out-of-court statement of a dead declarant, if made under oath at a trial, hearing, or other proceeding, when the statement is not specifically covered by any other hearsay exception, but the statement has equivalent circumstantial guarantees of trustworthiness. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §804.11 (8th ed. 2004); J. Corkery, Illinois Civil & Criminal Evidence §802.113 (2000). The trial court found that Ortiz's testimony was trustworthy and that there were equivalent guarantees of trustworthiness to admit it, despite the lack of cross-examination by defendant or anyone on defendant's behalf.[1]

If the trial court's evidentiary ruling was erroneous, the next question is whether that error was harmless. If this ruling was erroneous and was not harmless, that ends the case and defendant must receive a new trial. Only if the trial court's section 115–10.4 ruling was not erroneous, or was erroneous but harmless as an evidentiary matter, should the appellate court turn to the constitutional challenge to the evidence. See *E.H.*, 224 Ill. 2d at 180. We vacate the appellate court's judgment and remand the cause for that court's initial consideration of nonconstitutional issues.

---

[1]According to defendant, his lack of cross-examination was particularly problematic because Paredes' defense theory was to exonerate himself by implicating defendant.

## III. CONCLUSION

For the foregoing reasons, the judgment of the appellate court is vacated, and the cause remanded to that court with directions that the court first consider the nonconstitutional issues raised, then reaching the constitutional issues only if necessary.

*Vacated and remanded*
*with directions.*

JUSTICE BURKE took no part in the consideration or decision of this case.