No. 1-03-3036

FIRST DIVISION
FILED: 9-28-07

THE PEOPLE OF THE STATE OF ILLINOIS,    )    Appeal from the
                                        )    Circuit Court of
                    Plaintiff-Appellee, )    Cook County.
                                        )
        v.                              )    No. 90 CR 12896
                                        )
EFREN MELCHOR,                          )    Honorable
                                        )    Fred G. Suria,
                    Defendant-Appellant.)    Judge Presiding.

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Defendant Efren Melchor was convicted after a jury trial of first degree murder and sentenced to 40 years' imprisonment. On appeal, this court reversed his conviction, holding that defendant's sixth amendment right to confrontation was violated when the trial court admitted the former testimony of Luis Ortiz, who was the sole eyewitness to identify defendant as the shooter. Ortiz had previously testified about the murder at the trial of a codefendant but had died prior to defendant's trial. People v. Melchor, 362 Ill. App. 3d 335 (2005) (unpublished in part pursuant to Supreme Court Rule 23).

The Illinois Supreme Court vacated the judgment of the appellate court on the ground that the appellate court should have first considered the nonconstitutional issues before proceeding to rule on the constitutional one. People v. Melchor, 226 Ill. 2d 24, 34-35 (2007), citing In re E.H., 224 Ill. 2d 172, 178 (2006). The supreme court remanded the case to the appellate court with instructions that this court answer two questions. Melchor, 226 Ill. 2d at 34-35. First, this court

must determine "whether the trial court erred in ruling that Ortiz's testimony was admissible pursuant to section 115-10.4 of the Code of Criminal Procedure (725 ILCS 5/115-10.4 (West 2004))." Melchor, 226 Ill. 2d at 35. Second, "[i]f the trial court's evidentiary ruling was erroneous, the next question is whether the error was harmless." Melchor, 226 Ill. 2d at 35. The supreme court instructed that "[o]nly if the trial court's section 115-10.4 ruling was not erroneous, or was erroneous but harmless as an evidentiary matter, should the appellate court turn to the constitutional challenge." Melchor, 226 Ill. 2d at 35.

## BACKGROUND

On April 30, 1990, Steven Botello (the victim) was shot to death at 2624 West Fullerton in Chicago. On May 6, 1990, defendant and codefendant Ancermo Paredes were arrested for the murder and were identified in a lineup as being involved in the shooting. Both were later indicted on two counts of murder. On May 15, 1990, defendant was released on bond and then failed to appear on several subsequent court dates. On October 2, 1990, his bond was forfeited and a warrant for his arrest was issued. Defendant remained a fugitive for the next 10 years.

On May 15, 1991, the bench trial of the codefendant began. The witnesses included the codefendant, who testified on his own behalf, and Luis Ortiz, who was the sole eyewitness to the shooting and 16 years old at the time of the shooting. Ortiz's testimony implicated both the codefendant and defendant. On May 20, the trial court found codefendant not guilty, and he was subsequently deported to Mexico. On September 11, 1998, Ortiz died as a result of a drug overdose.

On October 15, 2000, defendant was again arrested. Prior to defendant's trial the State

indicated its intent to use Ortiz's and codefendant's testimony from codefendant's trial because both were unavailable. Defendant moved to bar the State from using their testimony, claiming that their use would violate his confrontation rights and that the prior testimony, particularly that of Ortiz, did not bear sufficient guarantees of trustworthiness.

After a hearing, at which the State confirmed that Ortiz was the sole eyewitness to the shooting, the trial court denied the defendant's motion to bar and found Ortiz's prior testimony admissible pursuant to section 115-10.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.4 (West 2004)). However, the trial court denied the State's request to use the codefendant's prior testimony.

Defendant's jury trial began on March 18, 2003. Julio Diaz, who was 30 years old at the time of defendant's trial, testified that on April 29, 1990, from approximately 9 a.m. to midnight, he was playing basketball in Haas Park at Fullerton and Washentaw Avenues with Ortiz, the victim and "Tootie." According to Diaz, the group shared a quart of beer.

Dias testified that, at approximately 11:30 p.m., the group left the park and were walking down Fullerton to purchase more beer. At this time, they saw four Hispanic males coming in their direction on the same side of the street, none of whom Diaz recognized. Tootie said he was going to "mess with" them. A brawl ensued. Jamie Figueroa, who was also deceased at the time of defendant's trial, and Mario Lopez joined the fight. After approximately 10 minutes, the fight broke up because the victim yelled that the police were coming.

Diaz testified that he and Figueroa hid in a viaduct for a few minutes after the fight broke up and then went to a pay phone. At this time, Ortiz and the victim were also there. The group

3

then walked to the intersection of Fullerton and California Avenues, where the victim left the group to visit his daughter who lived near the intersection. Approximately 10 minutes later, the victim returned. As the victim was walking toward them, Diaz observed a two-door gray Toyota hatchback automobile attempt to smite the victim. Diaz also observed four individuals in the automobile and recognized at least one of them as one of the men his group had been fighting with earlier. Diaz identified this man as the codefendant.

Diaz testified that the group then started walking eastbound on Fullerton toward a tavern. Diaz left the group to go to a nearby school playground. While there, Diaz heard two sounds that sounded like firecrackers. He alighted on his bicycle and rode toward Fullerton. He saw a squad car and the victim on the ground. At this point, he thought that the squad car had hit the victim. Diaz then rode the bike to a nearby gas station, purchased two hot dogs, and rode back to the scene of what he believed to be an accident. The victim was still lying on the street and, at this time, he found out that the victim had been shot. On cross-examination, he admitted that he never observed the person who actually shot the victim.

Diaz testified that he was a member of a gang and that Ortiz, the victim, Figueroa, Lopez and Tootie were also in the same gang. Diaz also stated that the four Mexicans were not in a gang because "you could tell," and that the fight did not start as a result of gang rivalry.

Christopher Donnelly, who had been the assistant State's Attorney who prosecuted the codefendant back in 1991, took the stand at defendant's trial and read aloud Ortiz's testimony from the codefendant's trial. Ortiz's testimony regarding the fight and attempted hit-and-run was basically consistent with Diaz's testimony. Ortiz testified that there were four individuals in the

4

car and that he saw the faces of two of them. Ortiz recognized the codefendant, as one of the individuals whom he had seen earlier that night in the fight. Ortiz also saw the shooter, whom he later identified as the defendant.

Ortiz testified that he, Diaz, the victim and Figueroa then walked eastbound on Fullerton. When they were in front of the tavern, Ortiz stopped and spoke to some friends. Diaz left on a bicycle to go to Gatither Park. The victim borrowed a bicycle and left because he had left his wallet at the park. Ortiz observed the victim looking for his wallet, when a small gray automobile pulled into the parking lot by the park. Ortiz recognized the automobile as the one that had tried to run over the victim earlier. The passenger side door opened; a man got out, reached over the roof of the car, and shot the victim. The shooter then got back in the automobile and it drove off.

Ortiz testified that on May 6, 1990, he went to Chicago police Area 5 headquarters and viewed a lineup. Out of the four-person lineup, he identified two individuals. He identified the codefendant as one of the individuals with whom he had been fighting and defendant as the shooter, who was not someone who had been involved in the fight. Ortiz also identified both individuals as passengers in the grey Toyota. On cross-examination, Ortiz gave varying distances between himself and the car at the time of the shooting, ranging from between 5 and 100 feet.

Chicago police detective Reynaldo Guevara testified that, shortly after the shooting, he arrested the defendant and codefendant. Detective Roland Palinsky testified that on May 6, 1990, at approximately 1 a.m., he conducted a four-person lineup that included defendant, defendant's brother and codefendant. Detective Palinsky testified that Ortiz viewed the lineup and identified defendant as the shooter and codefendant as a passenger.

5

The defense case included the testimony of: Nicholas Roman, defendant's work supervisor at the time of the murder; Renaldo Melchor Santana, defendant's brother; and defendant himself. Nicholas Roman, who was 50 years old, testified that he was working with defendant at the time of the murder. In April 1990, Roman was the second-shift supervisor of dishwashers and kitchen cleanup at a Streeterville-area restaurant, and defendant worked under him. Roman told the police that, on April 29, 1990, defendant began work between 1 and 1:30 p.m. and worked until approximately 1 a.m. Roman testified that he, defendant and Angel Castillo all left work at the same time, proceeding to the basement to change their clothes.

Roman was shown defendant's time card, which indicated that defendant punched in at 4 or 4:30 p.m. and punched out at 10:06 p.m. Roman explained that defendant punched out only for a 30-minute break and was unable to punch back in because the time clock was broken, as it frequently was. Roman and defendant worked together for approximately two years and were solely work acquaintances. Roman had not been in contact with defendant after his arrest in 1990.

Renaldo Melchor Santana, defendant's brother, testified that on May 5, 1990, he was in a bar where he saw codefendant, whom he recognized because they lived in the same building. Defendant later came to the bar to get Reynaldo. At this time, codefendant was arrested. According to Reynaldo, approximately one-half hour later, he, defendant, and two other individuals were also arrested. Reynaldo and defendant were both placed in a lineup. Thereafter, Reynaldo was allowed to leave the police station, but defendant was not.

Defendant testified that in April 1990, he worked as a dishwasher at a Streeterville-area

6

restaurant with his supervisor, Nicholas Roman. On April 29, 1990, defendant worked from 1 p.m. until approximately 12:30 a.m. He left work with Roman and others, changing clothes in the basement. He did not remember if he punched out that night, and he thought that he had taken a break at around 10 p.m. He took two different el trains home, which took approximately 20 or 30 minutes.

Defendant testified that he knew codefendant because they lived in the same building, but they socialized only occasionally. Defendant denied owning a gun or a grey Toyota automobile and denied being a passenger in a grey Toyota on April 29 or 30, 1990. Defendant denied shooting anyone during that time or belonging to a gang.

Defendant testified that on May 5, 1990, he went to a bar to look for his brother. At approximately 12:30 a.m., the police arrived and arrested both him and his brother. Defendant testified that he did not know what was going on. Defendant did not remember the date he made bail but admitted he knew he had to come back to court. He failed to appear because his brother had been threatened by gang members and believed that defendant would have been killed if he had appeared in court. From 1990 to 2000, defendant moved often, worked at restaurants and was paid in cash.

After the jury found defendant guilty of first degree murder, he filed a timely motion for a new trial, in which he alleged that the trial court erred in: (1) admitting Ortiz's testimony; (2) refusing to allow defendant to impeach Ortiz's testimony with a robbery charge that was pending at the time of codefendant's trial; and (3) refusing to allow defendant to impeach Ortiz's testimony with a 1994 conviction for armed robbery. The trial court denied his motion.

No. 1-03-3036

After a sentencing hearing, the trial court sentenced defendant to a prison term of 40 years. Defendant timely appealed. On May 14, 2003, defendant pled guilty to bail jumping. He was sentenced to 13 years' imprisonment for that offense, to run consecutive to his sentence for murder.

The appellate court reversed, holding that the admission of Ortiz's testimony, violated defendant's sixth amendment right of confrontation, pursuant to Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), and that this error was not harmless. The appellate court also held that the defendant did not forfeit his confrontation clause claim by his own wrongdoing, namely, his bail jumping. The appellate court reversed defendant's conviction and remanded to the trial court for a new trial.

The Illinois Supreme Court vacated the judgment of the appellate court and remanded to the appellate court with instructions to first consider the nonconstitutional issues before proceeding to rule on the constitutional issues.

ANALYSIS

The Illinois Supreme Court has remanded this case to this court with instructions that we determine: first, whether the trial court erred in ruling that Ortiz's testimony was admissible pursuant to the dead man's exception (725 ILCS 5/115-10.4 (West 2004)) to the hearsay rule; and second, if the trial court's hearsay ruling was error, whether that error was harmless. Melchor, 226 Ill. 2d at 35. Only if the ruling was not error or the error was harmless may we proceed to the consideration of the sixth amendment issue. Melchor, 226 Ill. 2d at 35.

Hearsay Exception

8

No. 1-03-3036

The rule against hearsay generally prevents the introduction at trial of out-of-court statements offered to prove the truth of the matter asserted. People v. Murdock, 259 Ill. App. 3d 1014, 1024 (1994). However, the rule has many exceptions. Section 115-10.4 (725 ILCS 5/115-10.4 (West 2004)) provides a statutory exception to the hearsay rule, for the prior testimony of a dead man. It states in pertinent part:

"(a) A statement not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule if the declarant is deceased and the court determines that:

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;

(3) the general purposes of this Section and the interests of justice will best be served by admission of the statement into evidence.

* * *

(d) Any prior statement that is sought to be admitted under this Section must have been made by the declarant under oath at a trial, hearing or other proceeding and been subject to cross-examination by the adverse party." 725 ILCS 5/115-10.4 (West

9

No. 1-03-3036

2006).

In sum, with respect to a dead man's prior testimony, this section requires a court to consider (1) materiality (725 ILCS 5/115-10.4(a)(1) (West 2006)); (2) probative value (725 ILCS 5/115-10.4(a)(2) (West 2006)); (3) trustworthiness of the statement (725 ILCS 5/115-10.4(a)) (West 2006)); (4) interests of justice (725 ILCS 5/115-10.4(3) (West 2006)); and (5) prior opportunity for cross-examination (725 ILCS 5/115-10.4(d) (West 2006).

The standards of review for these five requirements are not the same. "Reviewing courts sometimes state, as a blanket rule, that all evidentiary rulings are reviewed deferentially." (Emphasis in original.) People v. Drum, 321 Ill. App. 3d 1005, 1009 (2001); People v. Purcell, 364 Ill. App. 3d 283, 293 (2006) ("[g]enerally" abuse of discretion standard applies to evidentiary rulings). However, "the abuse-of-discretion standard is only a general rule [citation], and important exceptions exist." (Emphasis in original.) Drum, 321 Ill. App. at 1009; Purcell, 364 Ill. App. 3d at 293 ("evidentiary rulings are occasionally reviewed de novo"). For example, the statute at issue, section 115-10.4, requires that the witness was "subject to cross-examination by the adverse party." 725 ILCS 5/115-10.4 (d) (West 2004). The question of "whether the witness is subject to cross-examination [] do[es] not involve the trial court's discretion and accordingly [is] reviewed de novo." Drum, 321 Ill. App. at 1009 (discussing similar requirement in section 115.10.1). By contrast, the remaining four requirements of materiality, probative value, trustworthiness and interests of justice do "depend[] on the context in which the statement is offered at trial" and thus are subject to discretionary review. Drum, 321 Ill. App. at 1009 (inconsistency for purposes of prior inconsistent statement depends on "context"); People v.

10

Brown, 303 Ill. App. 3d 949, 961 (1999) (trial court's determination that a hearsay statement was trustworthy under section 115-10.2 "will not be disturbed absent an abuse of discretion"). [1] "A trial court abuses its discretion only when its ruling is " ' " 'arbitrary, fanciful *** or " 'where no reasonable man would take the view adopted by the trial court.' " ' " [Citations.] People v. Santos, 211 Ill. 2d 395, 401 (2004).

The fifth requirement, opportunity for cross-examination, was not in effect at the time of defendant's trial. On June 17, 2005, an amendment to section 115-10.4 was approved that added the following language to the end of paragraph (d): "and been subject to cross-examination by the adverse party." Pub. Act. 94-0053, eff. June 17, 2005. This change took effect on June 17, 2005, and was not in effect at defendant's jury trial which began on March 18, 2003. Melchor, 362 Ill. App. 3d at 342, vacated on other grounds by Melchor, 226 Ill. 2d at 27. Thus, this court

---

[1]In his brief to this court, defendant claimed that the standard of review for the fourth requirement, trustworthiness, was de novo. In support of this claim, defendant cited two cases: In re D.G., 144 Ill. 2d 404, 408-09 (1991), and People v. Garriott, 253 Ill. App. 3d 1048, 1050 (1993). In Garriott, this court held that de novo review applied to the question of "whether a defendant's refusal to submit to a breathalyzer test, after an arrest for DUI on private property, is admissible at trial." Garriott, 253 Ill. App. 3d at 1049. In D.G., we stated with respect to de novo review that "where neither the facts nor credibility of the witnesses is contested, the issue of whether probable cause exists is a legal question which a reviewing court may consider de novo." D.G., 144 Ill. 2d at 408-09. Neither case is on point.

will analyze only the first four requirements, which were in effect at the time of defendant's trial, and will analyze them under an abuse-of-discretion standard.

The trial court did not abuse its discretion in finding that the first two requirements, materiality and probative value, were satisfied; and defendant does not claim otherwise. First, the statute requires the statement to be "evidence of a material fact." 725 ILCS 5/115-10.4(a)(1) (West 2004). The statement at issue, namely Ortiz's prior testimony, established the fact that defendant was the shooter. The identity of the sole gunman is clearly material to a murder trial.

Second, the statute requires that the evidence be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." 725 ILCS 5/115-10.4(a)(2) (West 2004). Ortiz's testimony was more probative as to the shooter's identity than any other evidence offered, since he was the sole eyewitness to identify the shooter. Ortiz testified that a grey automobile pulled into a parking lot by a park late at night, and then a man exited the passenger side door, reached over the roof of the automobile and shot the victim. At a lineup, Ortiz identified defendant as the shooter and codefendant as another individual in the automobile.

The trial court did not abuse its discretion in finding that Ortiz's testimony was more probative as to the shooter's identity than any other evidence that the State could reasonably procure.[2] The record indicates that there were five people on the scene at the time of the shooting

---

[2] The trial court ruled: "It is absolutely clear from both sides that the evidence offered by Mr. Ortiz [sic] there is no other person that either side is aware of who can give the testimony that he would give were he present."

other than the victim:  four people in the shooter's automobile and Ortiz.  Of the four people in the automobile, Ortiz identified only two: defendant as the shooter and codefendant as a passenger.  Thus, the only identified eyewitness to the shooting besides Ortiz was codefendant, and during the time that defendant was a fugitive, codefendant had been tried, acquitted and deported to Mexico.   In addition, the trial court ruled that the codefendant's prior testimony was inadmissible as untrustworthy.

The third statutory requirement is trustworthiness.  The statute requires the statement to have "circumstantial guarantees of trustworthiness."  This court has held that this trustworthiness requirement limits the dead man's exception "to exceptional circumstances."  People v. Smith, 333 Ill. App. 3d 622, 634 (2002).

To evaluate trustworthiness, a trial court must consider "the totality of the circumstances surrounding the declaration."  Smith, 333 Ill. App. 3d at 638.  In Smith, this court listed a number of factors that a trial court could consider, without holding that consideration of any one factor was required or dispositive.  Smith, 333 Ill. App. 3d at 635-38.

We did hold that a "significant factor" was whether the prior statement had been subject to cross-examination.  Smith, 333 Ill. App. 3d at 637.[3]  Thus, even though the statute had not yet been amended to include this requirement explicitly, Illinois courts were already considering it as a

---

[3]In Brown, this court held, with respect to a different hearsay exception, that the opportunity to cross-examine the declarant was a significant factor in analyzing "the trustworthiness of a hearsay statement."  Brown, 303 Ill. App. 3d at 961 (discussing section 115-10.2 of the Code of Criminal Procedure (735 ILCS 5/115-10.2).

No. 1-03-3036

factor in their trustworthiness analysis.[4]  Cross-examination was relevant to analyzing trustworthiness because cross-examination provided an "opportunity for testing the truth" of the statement.  Smith, 333 Ill. App. 3d at 637.  In the case at bar, there is no dispute that defendant did not cross-examine Ortiz.

Before cross-examination became a statutory requirement, its lack did not automatically bar a dead man's statement as untrustworthy.  Smith, 333 Ill. App. 3d at 637.  Instead, the question was what issues could cross-examination have successfully "explored."  Smith, 333 Ill. App. 3d at 637.

One issue that cross-examination explores is the witness's credibility. Credibility is

_____

[4]Judge Wolfson in a special concurrence takes issue with our precedent that included the opportunity for cross-examination as part of our trustworthiness analysis.  However, it is hard to dispute that cross-examination has historically been the primary vehicle by which advocates have tested the trustworthiness of statements. Crawford v. Washington, 541 U.S. 36, 61, 158 L. Ed. 2d 177, 199, 124 S. Ct. 1354, 1376 (2004) (reliability is best determined "by testing in the crucible of cross-examination"). This court takes no position on whether the statute is unconstitutional on its face after Crawford, as the concurring judge concludes, except to note that Crawford applies only to testimonial statements and many statements permitted by this exception would still be admitted under Crawford as nontestimonial statements.  Crawford, 541 U.S. at 61, 158 L. Ed. 2d at 198, 124 S. Ct. at 1370 (applied only to "testimonial" statements).  In addition, the Crawford Court noted that there may be an exception to its holding for "dying declarations." Crawford, 541 U.S. at 55 n.6, 158 L. Ed. 2d at 195, 124 S. Ct. at 1367.

14

evaluated primarily based on the witness's physical reaction to the questions, such as demeanor and tone of voice. Samour, Inc. v. Board of Election Commissioners of the City of Chicago, 224 Ill. 2d 530, 548 (2007) (fact finder evaluates credibility based on "conduct and demeanor"); Best v. Best, 223 Ill. 2d 342, 350 (2006) (same). That is why our system favors live testimony and defers to the fact finder, who can observe witnesses firsthand. Best, 223 Ill. 2d at 350 (reviewing court defers to fact finder "because it is in the best position to observe the conduct and demeanor"); Samour, 224 Ill. 2d at 548 (same); Vicencio v. Lincoln-Way Builders, Inc., 204 Ill. 2d 295, 310 (2003) ("strong preference for live testimony").

At the bench trial of codefendant, Ortiz was alive, 16 years old and subjected to cross-examination. He was the sole eyewitness to the shooting, implicating both codefendant and defendant – and yet the trial court acquitted codefendant. The inference is strong that when the fact finder could view Ortiz on the stand, watching his body language and listening to his tone of voice, as opposed to simply hearing a dead transcript read into the record, the fact finder did not believe him.

By contrast, during defendant's trial, Ortiz's answers were read into the record by the State prosecutor,[5] who subsequently became a judge. After listening to the same answers that had previously led to an acquittal, the jury voted to convict.

Ortiz's credibility was the key issue. He was the only link between defendant and the crime. The court offered no physical evidence, such as fingerprints on a murder weapon; no

_____

[5] Ortiz's answers were read into the record at defendant's trial by Christopher Donnelly, who had been the assistant State's Attorney at the prior trial of codefendant..

statements by defendant; and no other witnesses linking defendant to the crime.

This court is not saying that live testimony is always required. The facts of this case are unique. Immediately after ruling to admit Ortiz's prior testimony, the trial court remarked: "It is a unique case. I never had one in my 40 years on the bench like this." The facts are unique because Ortiz's credibility was key, Ortiz was dead, and his live testimony had previously led to an acquittal.

In finding that codefendant's prior testimony was trustworthy, the trial court distinguished the Smith case. In Smith, we held that the grand jury testimony of a dead man was inadmissible as untrustworthy. Smith, 333 Ill. App. 3d at 638. The trial court in the case at bar distinguished Smith on the ground that in Smith there had been no opportunity for cross-examination, whereas "here there was cross-examination" by codefendant. However, codefendant's opportunity to cross-examine is not the same as the opportunity for defendant, where the motives of defendant and codefendant were not aligned. People v. Brown, No. 1-05-0995, slip op. at 14 (prior statement at bond hearing was not trustworthy where "defense counsel did not have a similar motive for cross-examining *** at the bond hearing as he would have had for cross-examination at trial"). Codefendant had every incentive to shift culpability away from himself and to defendant.

In addition to credibility, there were other issues that cross-examination could have explored. At codefendant's trial, codefendant's attorney did not ask a single question on cross-examination concerning: the witness' gang membership, the lineup identification of defendant, the witness' admitted consumption of alcohol, any desire for vengeance because the victim was a

16

member of the same gang as the witness, or any expectations of leniency with respect to the witness' pending robbery charge in juvenile court.

In addition to lack of cross-examination, other factors of untrustworthiness include: (1) the witness' "motivation to testify falsely"; (2) the witness' prior convictions and criminal history; (3) the witness' use of drugs or alcohol at the time of the events; and (4) the witness "hopes of making a deal." Smith, 333 Ill. App. 3d at 637. With respect to motive, the trial court found Ortiz's prior testimony trustworthy primarily because Ortiz, as a friend of the victim, had a motive to see the murderer "called to the bar of justice."[6] However, the last three factors point to the untrustworthiness of Ortiz's prior testimony.

First, the witness' felony conviction militated against a finding of trustworthiness. By the time Ortiz died at a young age of a drug overdose, he had 15 adult arrests and one felony conviction for armed robbery. He had used five different aliases and four different birth dates. The trial court did not consider the felony conviction relevant to the issue of Ortiz's credibility because it occurred after the testimony in question was given.[7] However, in Smith, we found that

---

[6]The trial court ruled: "As to the reliability or trustworthiness, I have to say human nature in my humble judgment is if I have a friend who is killed, I want to see the person who did the killing called to the bar of justice. It would serve no purpose to point someone else out who is not the shooter ***."

[7] The trial court found that the armed robbery conviction was not material to the issue of Ortiz's credibility "because it has no effect upon the original identification of the defendant in this case." Ortiz was arrested in 1994 and pled guilty in 1995 to armed robbery. He testified at the

the witness' "alleged theft of a car at the time of his death affected his credibility negatively." Smith, 333 Ill. App. 3d at 636. The theft, which was only alleged without a conviction, occurred after the statement in question was made, and yet this court still found it to be a relevant factor in its Section 5/115-10.4 trustworthiness analysis. Similarly, Ortiz's long criminal history, although occurring after the statement, points to the statement's untrustworthiness.

Second, the 16-year-old witness admitted consuming alcohol prior to witnessing the shooting. Third, he may have had hopes of making a deal. To rebut this suggestion, the person who had been the State prosecutor at codefendant's trial testified at defendant's trial that he did not make any promises of leniency and that he was not even aware of Ortiz's pending robbery charge in juvenile court.

However, the issue is not the state of mind of the prosecutor but that of the witness. In Smith, no promises had been made to the witness there either, but the court still considered it a relevant factor in its trustworthiness analysis, because the witness could still have "hopes of making a deal." Smith, 333 Ill. App. 3d at 637. Similarly, in the case at bar, although the prosecutor had not made any offers, Ortiz could still have harbored hopes of currying favor with the State.

Thus, in sum, this court finds Ortiz's prior testimony was untrustworthy because of: the lack of cross-examination where his testimony was the only link between defendant and the crime; his felony convictions and criminal history; his use of alcohol at the time of the events; and his possible hopes of currying a favor with the State in light of his pending robbery charge.

---

codefendant's trial in 1991.

No. 1-03-3036

The question then becomes whether defendant has the right to challenge the testimony's untrustworthiness, when it was his own time as a fugitive which prevented him from having the opportunity to cross-examine Ortiz. Recently, the Illinois Supreme Court held that the doctrine of forfeiture of wrongdoing requires "intent." People v. Stechly, 225 Ill. 2d 246, 277 (2007). The Supreme Court stated: "[W]e hold that the State must prove that the defendant intended by his actions to procure the witness' absence to invoke the doctrine of forfeiture by wrongdoing." Stechly, 225 Ill. 2d at 277. Defendant's act of skipping bail and failing to appear at trial, although wrongful, was not aimed at intentionally procuring Ortiz's absence at a future trial. Defendant had no way of knowing that Ortiz would die at a young age of a drug overdose in the intervening years while defendant was a fugitive. Thus, the doctrine of forfeiture of wrongdoing does not apply.[8]

Since we have found that the prior testimony was untrustworthy, we need not discuss the fourth requirement of section 115-10.4: "the interests of justice." 735 ILCS 5/115-10.4(a)(3). We have now answered in the affirmative the first question that the supreme court posed to us: "whether the trial court erred in ruling that Ortiz's testimony was admissible" pursuant to the dead man's exception to the hearsay rule. Melchor, 226 Ill. 2d at 35. Having answered that

_____

[8] Justice Burke had reached the same conclusion. She stated: "Ortiz's death from a drug overdose is not a logical outgrowth, forseeable result, or legitimate consequence of defendant's flight. *** [Thus,] defendant's conduct in escaping prosecution for 10 years did not constitute misconduct sufficient to invoke the forfeiture by wrongdoing rule." Melchor, 362 Ill. App. 3d at 355, vacated on other grounds, Melchor, 226 Ill. 2d at 27.

19

question in the affirmative, we now proceed to the second question: "whether that error was harmless." Melchor, 226 Ill. 2d at 35.

An error is harmless if "the result would have been the same absent the error." People v. Nitz, 219 Ill. 2d 400, 410 (2006). To determine whether an error was harmless, this court must consider: (1) whether the error "might have contributed to the conviction"; (2) whether other evidence is so "overwhelming" as to support the conviction; and (3) whether the erroneously admitted evidence is "cumulative or merely duplicates properly admitted evidence." People v. Thompson, 349 Ill. App. 3d 587, 594 (2004).

First, the error was very likely to have contributed to the conviction, since Ortiz was the only person to connect defendant to the crime.[9] Second, the other evidence was not overwhelming. There was no physical evidence linking defendant to the crime. The other evidence consisted primarily of defendant's flight from justice and the detective's description of the lineup at which Ortiz identified defendant. While flight provides some evidence of consciousness of guilt, it is far from overwhelming, and the detective's testimony concerning Ortiz's identification would have had little meaning by itself if Ortiz's testimony had not first been read into the record. Third, Ortiz's testimony was not cumulative, since he was the sole eyewitness to identify defendant as the shooter. Thompson, 349 Ill. App. 3d at 594 (admission of the victim's statements was not harmless error where the only evidence admitted at trial "to identify defendant as [victim's] attacker" were her statements and defendant's stationhouse

---

[9]The trial court found that "[i]t is true that this is basically a single-finger identification case."

confession). Thus, the error was not harmless.[10]

Since we have found both that the prior testimony did not satisfy the requirements of the hearsay exception and that this error was not harmless, there is no need for us to proceed to an analysis of the defendant's confrontation clause claim.

CONCLUSION

For the foregoing reasons, we reverse defendant's conviction, vacate his sentence, and remand this case for a new trial.

GARCIA, J., concurs.

WOLFSON, J., specially concurring.

---

[10]Justice Burke also found that the introduction of Ortiz's testimony into defendant's trial was not a harmless error. Melchor, 362 Ill. App. 3d at 355, vacated on other grounds by Melchor, 226 Ill. 2d at 27.

No. 1-03-3036

JUSTICE WOLFSON, specially concurring:

I do not see how we can decide this case without holding section 115-10.4, as it existed at the time of trial, was unconstitutional on its face. The legislature recognized that Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), nullified the statute, which was amended to include the Crawford requirement of a prior opportunity of the defendant to cross-examine the testimonial declarant. Instead, the majority treats the former statute as if it included a cross-examination requirement. It did not, and we should not pretend it did.

I agree with the majority's analysis of the right of the defendant to cross-examine. I agree that the defendant's right to cross-examine his accuser was violated in this case. But my agreement is based on the sixth amendment, not on some provision we might engraft on a patently unconstitutional statute.

I have no disagreement with the Illinois Supreme Court's instruction that nonconstitutional issues should get first consideration. Melchor, 226 Ill. 2d at 34-35. I just do not see how we can do that in this case.

In short, I agree with the majority's conclusion that the defendant's conviction should be reversed, but not the path it used to get there.

22